## HENRY P. SCOTT *vs.* THE BALTIMORE AND OHIO RAILROAD CO., ET AL.—NATHANIEL W. JAMES *vs.* THE SAME.

*Corporations—Preferred Stock—Construction of Certificate and Agreement Authorizing Issue—Rights of Holders of Preferred Stock in the Balto. & Ohio R. Co. Under the Reorganization.*

The rights of holders of preferred shares of stock in a corporation depend upon the terms of the contract, or of the statute, under which such shares were issued.

The agreements of the parties and resolutions of the corporation which authorized the issue of preferred stock may be considered in ascertaining the rights of the holders of such stock and the construction to be placed on the stock certificates.

When the certificates of preferred stock refer to the resolutions of the corporation authorizing its issue, and these to a plan of reorganization, they are all to be construed together as being *in pari materia.*

The Baltimore and Ohio R. Co. was placed in the hands of receivers in 1896. A plan for its reorganization was devised in 1898, which provided for the issue of mortgage bonds, and non-cumulative preferred stock and common stock, with which to liquidate the indebtedness of the

company. The stockholders assented to the proposed plan and it was carried out. The previously existing preferred stockholders were entitled, according to the language of their certificates, to a "perpetual dividend of six *per centum per annum* and no more." The reorganization plan and resolution of the corporation provided for the issue of preferred stock as follows : "$40,000,000 four per cent non-cumulative preferred stock. This stock will be entitled to receive non-cumulative dividends at the rate of four per cent *per annum* before the payment of any dividends on the common stock." The certificates issued for such stock set forth : "The holders of preferred stock to the amount now issued and such additional amounts as may be lawfully issued from time to time by the President and Directors of the company, pursuant to the resolutions of the stockholders duly adopted April 11th, 1899, are entitled to receive in each year out of the surplus net profits of the company for the current year such yearly dividend (non-cumulative) as the Board of Directors of said Railroad Company may declare, up to, but not exceeding four *per centum*, before any dividends shall be set apart or paid upon the common stock." *Held*, that the preferred stockholders, after receiving a dividend of four per cent in any one year, are not entitled to share with the common stockholders in the distribution of the residue of the net earnings, either equally or after the payment of a similar dividend to such common stockholders, but the preferred stockholders are entitled to a dividend of four per cent and no more, before the payment of any dividend to the holders of the common stock.

Appeals from a *pro forma* decree of the Circuit Court of Baltimore City, dismissing the bills of complaint.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John G. Johnson* and *Jno. J. Donaldson*, for the appellant James.

Where the charter is silent and there is no agreement to the contrary among stockholders, the law presumes equality of profit-sharing. *Hutton* v. *Scarborough Cliff Hotel Co.*, 2 Dr. & S. M., 514, 521; s. c., 4 D. J. & S. 672; *Allen* v. *Londonderry, etc., Rw. Co.*, 25 W. R. 524; *B. & Am. Tr. & Fin. Co.* v. *Cooper*, 6 R. 146; *S. C. on Appeal*, 63 L. J., ch. 296; *Gordon* v. *R. R. Co.*, 78 Va. 501; s. c., 22 Am. & E. R. R. C., 331; *Bangor* v. *Port Madoc Slate Co.*, L. R., 20 Eq. 59; *Harrison* v. *Mexican Rw. Co.*, L. R., 19 Eq. 358; *Ragland* v.

*Broadnax*, 29 Gratt. 401; *Guinness* v. *Land Corp.*, 22 Ch. Div. 349, 377.

Looking, then, to the charter, we find that in this instance the stock of both classes was issued as "capital stock" under the provisions of section 13 of the Act of 1826, ch. 123.

The charter here is not, however, silent as to profit-sharing. It provides for complete equality among stockholders (1826, ch. 133, section 19), " * * *, and that they" (the directors) "shall divide the same" (the net profits) "among the proprietors of the stock of said company, *in proper proportion to their respective shares.*" Any variation, then, of the rights of any of the stockholders must accordingly be found elsewhere than in the charter.

It is to be found, if at all, in an agreement between the stockholders themselves. It is a *concessum* in the case that the "plan and agreement" was assented to by all the stockholders of every class then existing.

The rights, therefore, of the new stock issued under the "plan and agreement" must be found in its terms. In regard to the "common stock" this instrument is silent as to profit-sharing. As to the "preferred stock," all that is said on this head is as follows, viz.: "*$40,000,000 four per cent non-cumulative preferred stock.* This stock will be enitled to receive non-cumulative dividends at the rate of four per cent *per annum* before the payment of any dividend on the common stock."

The resolutions of the board and the stockholders, the decretal order of the United States Court and the form of certificates in no way differ from the provisions of the "plan and agreement."

The only variation from the charter is in calling the proposed issue "preferred stock" and in defining the extent of its preference, viz.: That it is to receive its dividend (non-cumulative) before payment of any dividend on the common stock. *There is absolute silence as to the disposition of net earnings applicable to dividends over and above the four per cent to the preferred stock.* Accordingly for this we must look to the char-

ter, and that provides, as we have seen, *in express terms* for equality. (1826, chapter 123, section 19.) Both classes of stock were issued under the same charter provision (1826, chapter 123, section 13), and are both equally within the contemplation of the provisions of section 19 of that Act.

Even if, however, the rights of the preferred stock as to profit-sharing rested merely on the form of the certificate, it is submitted that this is equally silent as to the division of net earnings applicable to dividends after the four per cent has been paid to the preferred stock. The words used as to the division of earnings are but the equivalent in meaning of those contained in the "plan of agreement," as will most clearly appear by putting them side by side.

To sum up, this part of the discussion we find:

1. That not merely by established rules of law, but *by the express terms of the charter*, there was to be entire equality of profit-sharing among all stock issued under it.

2. That when by unanimous consent of the proprietors this was changed, their contract was contained in the "plan and agreement."

3. That the subsequent proceedings with regard to the stock issues referred to and were taken under the "plan and agreement," and therefore must be controlled by its terms, even if there were a difference, the "reorganization managers" and "voting trustees" deriving their authority for the same solely from the "plan and agreement."

4. That there is, however, no difference in meaning between the terms of the "plan and agreement" and those contained in the other proceedings.

5. That the "plan and agreement" (as well as the proceedings under it) must be taken to vary the provisions of the charter only so far as they so do by express terms or necessary implication.

6. That as to profit-sharing the only variation made from the terms of the charter by the contract is that the preferred stock is to receive its four per cent before any dividend is made to the common stock, but as to the disposition of earn-

ings applicable to dividends after four per cent has been paid to the preferred stock, the contract is absolutely silent.

7. That accordingly such surplus earnings are as to their distribution governed by the terms of the charter which prescribe entire equality, and so must be divided "among the proprietors of the stock of said company in proper proportions to their respective shares." (1826, ch. 123, section 19.)

8. That, as a result, after a dividend of four per cent to the preferred stock and a like dividend of four per cent to the common stock, the surplus earnings applicable to dividends are distributable among all the holders of stock, preferred and common, share and share alike.

*John N. Steele* (with whom were *Semmes, Carey & Bond* on the brief), for the appellant Scott.

The scheme devised by the plan of reorganization was this : A syndicate was formed consisting of Messrs. Speyer Brothers, of London, and Messrs. Speyer & Company, Kuhn, Loeb & Co., August Belmont & Co., Hallgarten & Co., and Vermilye & Co., of New York. This syndicate agreed to purchase a large amount of the new preferred and common stock, and to offer it for sale to holders of the old first and second preferred aud common stock, upon the following terms : The holders of the first and second preferred and common stocks should " purchase " from the syndicate the new preferred and common stocks by depositing their old stock with the Mercantile Trust Company of New York, or its agency in London. In addition to depositing their stock, depositors of first preferred stock were to pay two dollars per share deposited for new preferred and common stock ; depositors of second preferred stock were to pay twenty dollars per share deposited for new preferred and common stock ; and depositors of common stock were to pay twenty dollars per share deposited for new preferred and common stock.

Upon the completion of the reorganization, the reorganization managers, on behalf of the syndicate, were to deliver to the depositors who had made the required payments, new securities as follows :

For each share of first preferred stock, $52.50 in new preferred stock trust certificates; $75.00 in new common stock trust certificates.

For each share of second preferred stock, $20.00 in new preferred stock trust certificates; $150.00 in new common stock trust certificates.

For each share of common stock, $20.00 in new preferred stock trust certificates; $100.00 in new common stock trust certificates.

In this manner all of the outstanding stock was to be purchased and practically cancelled, and entirely new preferred and common stock was to be created and issued.

The manner in which the surplus profits are to be disposed of, depends always upon the contract under which the stock was issued. This contract is found in the plans, agreements, resolutions, minute-books, reports, decrees and other proceedings which precede and authorize the issue of the stock, as well as in the certificate itself. All of these may be resorted to for the purpose of showing what is the real character of the transaction and the real contract under which the stock was issued. 1 *Cook, Corporation,* sec. 269; *Bailey* v. *Railroad Co.,* 17 Wall. 96; *Boardman* v. *Railroad Co.,* 84 N. Y. 157.

The plan says nothing as to the disposition to be made of the surplus profits remaining after the payment of the preferred dividend. Whether this surplus is to go entirely to the common stockholders; whether it is to be equally distributed between holders of preferred and common stock; or whether it is to be used in paying common stockholders a dividend equal to that paid preferred stockholders, after which both classes of stock will share *pro rata* in what remains, is not stated; upon all of these important points the contract, as set forth in the plan, is absolutely silent.

1. The preferred stock is entitled to share ratably with the common stock in the surplus profits remaining after the payment of the preferred dividend, and its right to receive such dividend does not deprive it of its right to share in such surplus profits. It is well-settled that unless the contrary is ex-

pressly provided, all stock stands upon an equality, and is en-
titled to share equally in any distribution of profits.    The law
on this point is well stated in *Cook on Corporations*, sec. 540.
See also *State* v. *B. & O. R. Co.*, 6 Gill, 363; *Ry. Co.* v.
*Hambleton*, 77 Md. 341.

In the absence of any provision to the contrary, preferred
stock differs from common stock only in that it is entitled to
a certain dividend before the common stock is entitled to any.
In all other respects preferred and common stock stand upon
exactly the same footing.    They are both essentially capital,
both have the same right to vote, the same voice in the affairs
of the corporation (*Cook on Corporations*, sec. 269); both are
liable to creditors for unpaid subscriptions, and upon dissolu-
tion of the corporation they share equally without preference
in the distribution of corporate assets.    (*Cook on Corporations*,
sec. 278.)    The sole distinction between them is that when
there are profits the preferred stock shall receive a given divi-
dend before the common stock shall receive any dividend.
Beyond this, preferred stock has no preference, and labors
under no restriction, which does not equally attach to the
common stock.    When, therefore, the preferred dividend has
been paid on the preferred stock, the sole distinction between
it and the common stock has been eliminated.    To then deny
to the preferred stock any right to share in surplus profits still
remaining, would be to say that some distinction between them
still exists, and that the provision giving the preference at the
same time imposed a restriction, so that a provision that was
meant to be entirely beneficial will also operate to the preju-
dice of the preferred stock.    *Cook on Corp.*, secs. 12, 267, 269;
23 *Am. & E. Ency. of Law*, 607; *Totten* v. *Tison*, 54 Ga. 139;
*Chaffee* v. *Rutland R. Co.*, 55 Vt. 110; *Miller* v. *Ratterman*, 47
Ohio St. 141; *State* v. *Cheraw R. Co.*, 16 S. C. 524.

The sort of stock represented by the trust certificates held
by the complainant in this cause is the sort of stock which is
described in the plan of reorganization.    The complainant has
a right to insist that the incidents of this stock shall be as
stated in the contract.    That the preferred stock must receive

all the *privileges* therein set forth is clear. Is it not equally clear that no *restriction* should attach to it not imposed by the contract? To give the complainant a dividend of four per cent before the payment of any dividend on the common stock is simply giving him what was agreed to be given by the plan. To say that in no event he shall receive *any more* than four per cent is to put a limitation upon the right of his stock to receive dividends which is not contained in or in any manner authorized by the contract, and which cannot be inferred from any language used in the contract. In order to confine the preferred stock to a four per cent dividend, and no more, words implying this restriction must be added to the contract. As it stands there is nothing whatever to limit the preferred stock to its preferred dividend.

In the present case the contract expressly provides that the preferred dividend shall be "non-cumulative." If, however, this provision had been omitted, and if the preferred stock had been issued without any mention of whether or not the dividends should be cumulative, it is well settled that they would be held to be cumulative. *Cook, Corporations*, sec. 273; *Boardman* v. *Lake Shore and Michigan Southern R. R. Co.*, 84 N. Y. 157; *Elkins* v. *Camden and Atlantic Railway Co.*, 36 N. J. Eq. 233.

If it is true that the right of preferred stock to its preferred dividend carries with it the restriction that the stock can have no greater dividend, why should not the Courts hold; that in the absence of an express provision making the dividends cumulative, the right of preferred stock to its preferred dividend carries with it the restriction that in case the profits in any one year are not sufficient to pay the preferred dividend, the deficiency cannot be made up from profits earned in succeeding years? But the Courts, as already stated, hold the dividends cumulative when there is no attempt to "limit or restrict" the right to a preferred dividend to the profits of any one year. For the same reason, we contend that when there is no attempt to "limit or restrict" the preferred stock to its preferred dividend, no such restriction can exist. In the case

at bar the preferred stockholders ask for no greater *priority* than their contract gives them. When this has been recognized they simply ask *equality.* They ask that a situation be not created whereby, by a forced construction of the contract, the common stockholders may obtain priority over them. *Cook on Corp.*, sec. 269; 1 *Elliott on Railroads*, sec. 84; 2 *Beach on Public Corp.*, sec. 501.

It is clear, therefore, that in the opinion of the standard text writers, the preferred stock is entitled to share *pro rata* with the common stock in the surplus profits remaining after the payment of the preferred dividend and after the payment of a like dividend on the common stock. We do not think an authority can be found which does not go at least to this length, and give at least this right to preferred stock. Nowhere is·it denied that in the absence of a contrary provision in the contract preferred and common stock share *pro rata* in the surplus remaining after the common stock has received a dividend equal to that declared on the preferred stock. But although this seems to be the settled law as laid down in the text books, we have not found any satisfactory reason, nor, in fact, any reason, why the preferred stock should not share ratably with the common stock in the surplus profits remaining after the payment of the preferred dividend, or why its right to do so should be postponed until the common stock has received a like dividend.

2. The reorganization plan, and subsequent written proceedings, determine the rights of the preferred stock, and all evidence of the understanding of the reorganization committee is inadmissible.

3. The power of the reorganization managers to construe the plan and agreement did not include the power to make fundamental changes in the character of the securities to be issued, and in any event the construction given the plan by the managers must be found as expressed in the Vorhees proposition, its acceptance by the railroad, its ratification by the Circuit Court of the United States, and the new securities issued in accordance therewith.

4. An agreement between parties to a contract that any dis-
pute which may thereafter arise shall be settled conclusively
by the decision of a body of individuals, is an attempt to oust
Courts of Justice of their jurisdiction, and therefore void.   If
the contention of the defendant prevails, it follows that the
complainant will be bound by whatever construction the man-
agers place upon that portion of the plan which provides for
the issue of the preferred stock.   The managers will be the
final arbitrators of what the rights of the preferred stock are,
and the Courts will be closed to the complainant as a means
of enforcing whatever may be his legal rights.   It is well
settled, however, that parties to a contract have no power to
bind themselves in advance that a controversy which may pos-
sibly arise shall be conclusively settled by the decision of an
individual or set of individuals.   Agreements to this effect are
held to be attempts to oust the jurisdiction of Courts of jus-
tice, and therefore void as against public policy.   *Parsons on
Contracts*, vol. 2, sec. 826; *Clark on Contracts*, 432; *Russell on
Arbitration*, 50; *Contee* v. *Dawson*, 2 Bland, 264; *Allegre* v.
*Maryland Ins. Co.*, 6 H. & J. 413; *Insurance Co.* v. *Morse*, 20
Wall. 445; *Doyle* v. *Continental Ins. Co.*, 94 U. S. 535; *White*
v. *Middlesex R. R. Co.*, 135 Mass. 216; *Reed* v. *Insurance Co.*,
138 Mass. 572; *Badenfeld* v. *Mass. Mu. Accident Asso.*, 154
Mass. 77; *Kinney* v. *B. & O. Emp. Rel. Asso.*, 35 W. Va. 385;
*Bauer* v. *Sampson Lodge K. of P.*, 102 Ind. 262; *Mentz* v.
*Aremenia Fire Ins. Co.*, 79 Pa. St. 486; *Gere* v. *Council Bluffs
Ins. Co.*, 67 Iowa, 272; *Chamberlain* v. *Connecticut Central R.
R. Co.*, 54 Conn. 472.

*William D. Guthrie* and *Hugh L. Bond, Jr.*, (with whom
was *Edward C. Henderson* on the brief), for the B. & O. R.
Co., appellee.

We are not dealing with the incorporation of a company
having an authorized capital divided into shares of common
and preferred stock and the presumption which may then arise
that all stockholders are presumed to share alike, unless other-
wise expressly provided.   There is no such presumption here,

and this is conceded by the alternative prayer of the bill.    But
we are dealing with this particular case of common stock which
had been entitled for over sixty years to all dividends not nec-
essary to meet fixed rates on preferred stock.

The certificates of stock for both common and preferred,
purport on their face to state what the preferred stock is en-
titled to receive, and in that respect language could be hardly
plainer.

It is proposed by the appellants that the Court shall read
into each of the certificates for preferred and common stock
one of two alternative provisions as setting forth the contract
rights of the preferred stockholders, although they are unable
to say which alternative represents the true intention of the
parties or the contract rights of the holders of preferred stock
as understood by themselves.    Thus, the complainants, who
are asking the Court to construe their contract and to award
them their contract rights, find themselves unable to state that
contract or those rights except hypothetically, in alternative
propositions which differ radically from each other.

In other words, the Court is asked to construe the language
of the certificates so as to add a provision on the one hand
immensely beneficial to the preferred stock and doubling its
value, and, on the other hand immensely prejudicial to the
common stock and destroying much of its value.

The bills of complaint in these cases aver the plan of reor-
ganization and certain offers and resolutions which antedated
the execution and the delivery by the railroad company of the
certificates of stock and their issuance to the public.    These
antecedent transactions were evidently alleged as tending to
show intention.    The defendants met that issue by showing
that so far as the *intention* of the reorganization committee
and managers was concerned or was relevant, that intention
was clearly to limit the preferred stock to four per cent.    It
may, however, seem to the Court that such antecedent trans-
actions are not admissible, but must be conclusively presumed
to have been merged or waived in the stock certificates.    It
may well be interesting in this case to observe that each side

believes that by relating back to antecedent negotiations and transactions support may be found for its contention as to what the actual *intention* was, but that very fact brings into strongest relief the propriety and wisdom of the rule which excludes such evidence and considerations. This must necessarily and particularly be so in the cases at bar, for if another rule be sanctioned, buyers and sellers of the stock of this railroad company or of any corporation, dealing in the markets of the world, would find their contract rights dependent not upon the terms of the certificates, which are the muniment of title, but upon what was *intended* years before and perhaps only recorded in the more or less correct and retentive memories of those who participated in reorganizing the finances of the company and the issuing of its securities. These antecedent transactions and all reasonable probabilities seem to support the contention on behalf of the common stock, and are helpful as showing the surrounding circumstances, but the Court will decline to vary the legal effect of the final instrument when this would bend an important rule of law so as to create a precedent and introduce a practice which would be found fundamentally unsound and unsettle innumerable and enormous transactions. The only safe and true course is to adhere to the written contract as it is recited in these stock certificates, and not attempt to add to or vary the provisions by going back to antecedent transactions.

Three questions were presented for determination by the directors and stockholders as to the nature and rights of the the new preferred stock; first, whether they should proceed under the only existing statutory authority and create a so-called preferred stock with lien, or proceed irrespective of this statute and depend exclusively on an agreement among the stockholders themselves; secondly, what the dividend on the preferred stock should be and its character; and, thirdly, whether that dividend should be guaranteed.

The short description of the new stock as "four per cent non-cumulative preferred stock," of itself conveyed no definite meaning or clear rights. It might be preferred stock similar

in character to the existing preferred stock, which was entitled
to no more than its fixed dividend ; or it might be preferred
stock under the Maryland Code ; or it might be one of nu-
merous other forms of preferred stock.

In *Heller* v. *Marine Bank*, 89 Md. 602, 611, this Court itself
said : "Calling stock preferred stock does not *per se* define the
rights in such stock, but these depend on the statute or contract
under which it was issued." To same effect is *Elkins* v. *Camden
and Atlantic Railroad Co.*, 36 N. J. Eq. 233, 236; *Henry* v.
*Gt. N. Ry. Co.*, 1 De G. & J. 636. Indeed it is obvious that
it could not be otherwise, inasmuch as in practice "preferred
stock," quite as often as not, shares with the common in the
distribution of profits after both classes are made equal. *Gor-
don's Ex'ors* v. *R. F. & P. R. R. Co.*, 78 Va. 501.

In speaking of the well-settled rule for the construction of
contracts and statutes which is concisely stated in the maxim
*"Expressio unius est exclusio alterius,"* or, as it is otherwise
worded, *"expressum facit cessare tacitum,"* VICE-CHANCELLOR
REED, in *Greer* v. *Van Meter*, 54 N. J. 274, 275, used language
particularly pertinent to the certificates of stock before this
Court : "The maxim quoted embodies an obvious rule of
logic—viz.: that, when parties have set out specifically the
things for which they have bargained, it is a logical inference
that they completed their contract in respect to all matters re-
lating to the one concerning which there is an express agree-
ment, and therefore it is entirely reasonable to assume that so
far the agreement was the final expression of the parties limit-
ing their rights and obligations. * * * In such case the
express agreement, in respect to this matter, would carry with
it the implication that it contained the entire measure of the
complainants' rights." See also *Weckler* v. *First National Bank*,
42 Md. 581, 593; *Johns* v. *Hodges*, 62 Md. 525, 538.

Let us now divide and analyze the language actually used :
1. *"The holders of preferred stock are entitled to receive in each
year * * * four per centum."* If the language used had
stopped there, it is quite clear that it would mean that the
dividend right of the preferred stock was limited to four per

cent. It was not necessary to add the negative *"and no more."*
The fixed rate to which the preferred stock would then have
been *entitled* would clearly have been four per cent wholly
.irrespective of what the common stock got.   But the parties
did not desire to create a guaranteed and fixed rate of four per
cent similar to the guaranteed fixed rates of the past, and
they, therefore, inserted the following :

2. *"Out of the surplus net profits of the company for the cur-
rent year such yearly dividend (non-cumulative) as the board of.
directors of said railroad company may declare, up to but not
exceeding four per centum."*   This language made it clear, in
contrast with the old existing certificates, that the rate should
not be fixed ; that it should not be guaranteed ; that it should
not accumulate ; and that it should not exceed four per
centum.

The reason why the words *"not exceediug four per centum"*
were employed instead of *"and no more,"* is evident.   The
intention was to express an agreement that the rate should not
necessarily be a *fixed* four per cent rate, but might he less if
the directors in their discretion so declared.   The words four
per centum and no more might not have so definitely expressed
that idea, and would have left the rights of the preferred in
this regard ambiguous.   Obviously it would have been sheer
· repetition to have then added the words *and no more,* so as to
make the certificate read : *"Entitled to not exceeding four per
centum per annum and no more."*

In the present case, the words chosen to express the inten-
tion to create a preference were : *"Before any dividend shall be
set apart or paid upon the common stock."*

If the parties had intended that the right to the four per cent
dividends should be not only preferential, but that in addition
the preferred stock should be entitled to share in the net profits,
language to express that important and radical and immensely
valuable right would have been inserted.   The expression
" preferential dividends " might have been used, as in *St. John*
v. *The Erie Railway Co.,* 10 Blatch. 271; but it was not.
Clearly the intelligent parties handling this extraordinary and

unusually important transaction would have added in definite language exactly the provision of one of the alternatives which the appellants now ask the Court to add or inject, if it had ever been intended to give the immensely valuable additional right which the holders of the preferred stock now seek, and to take away that much more from the common stock. Indeed, if the word "and" is inserted before this phrase, the construction is beyond question.

The contention of the preferred stock in its last analysis, therefore, is that the addition of these words, which are the only words expressing any intention to create a preference, had the effect not only (1) of making the dividend preferential, but also (2) of evidencing, by necessary implication, an intention to provide that the preferred stock should in addition share with the common stock in the surplus net profits after the payment of the preferential dividend of four per cent.

The expression "before any dividend shall be set apart or paid upon the common stock" was adopted because the form had been substantially in use for many years in connection with the certificates for the old second preferred stock. The language of the Act of 1868 and the certificates representing the old second preferred stock was "before any dividend is distributed to any of the stockholders of the said company," and the language adopted for the present certificates is "before any dividend shall be *set apart* or paid upon the common stock," which is perhaps more specific and stronger in favor of the preferred stock. *St. John* v. *The Erie Railway Co.,* 10 Blatch. 271.

*J. Southgate Lemmon,* for the Voting Trustees.

The rights of the holders of the preferred and common stocks in this case must depend upon the language used in the certificates which were issued by the company and accepted by Mr. Vorhees, under whom the plaintiffs claim. Mr. Vorhees represented the creditors of the company, under authority conferred upon him by the reorganization managers, and the officers of the company represented the latter under resolutions

of the board, approved by the stockholders.   Mr. Vorhees made his proposition, the board voted it fair, and, subject to ratification of the stockholders, authorized "the proper officers of the company  *  *  *  to execute such contracts or other instruments as may be necessary or expedient to *formally accept* said proposition *and to carry out and perform the same."*

The transaction having been so closed, the certificates were distributed with the other new securities, and all parties to the plan became finally bound by the forms that were used.   In the distribution so made, each class of creditors and the syndicate took defined proportions of the bonds and preferred stocks, while the old preferred stockholders accepted pay in new preferred and common stocks.   This was all planned upon a basis attractive to every one, and there was no complaint by any one.   It is too late now, therefore, to rectify any errors of form or judgment.   The securities have been dealt with and scattered, and the situation cannot be replaced or changed without manifest injury to innocent holders of common stock, bought in good faith upon the credit of the certificates from those for whom Vorhees acted.   The equities are at least equal, and the Court will not interfere with what has been done.

As the proposed new preferred was not formative but additional stock, and was not even intended for subscription by the existing holders, Mr. Vorhees simply dealt with the corporation as a stranger and acquired no rights until the transaction was completed to the satisfaction of both.   *Hambleton* v. *Railway,* 77 Md. 346.

The new preferred stock, not being "formative," but in derogation of the chartered rights of the holders of the regular stock of the company, depended for validity upon the assent of all the holders of the regular stock, and as against them, no presumption will be intended.   The extent of their assent must be proven so clearly that every stockholder must have so uuderstood it.   If, as Mr. Donaldson says, the stockholders vote was cast by the reorganization managers, the record tells us, how those managers understood their assent, and even if this be rejected there is no proof to the contrary, and the

rights of the assenting stockholders will not be invaded by implication in a matter which depends entirely for its legality upon their understanding and assent. *Virginia* v. *Canal Co.*, 32 Md. 547.

Few, if any, of those stockholders knew the form used in the prior certificates while all were familiar with preferred stocks that carried fixed dividends, and when they assented to the new issue, they supposed they were again giving a preference in exchange for all that might be left. On the other hand, those who took the preferred stock, upon the terms of the plan, scarcely hoped for full four per cent dividends, and it was not until that hope was realized that any one dreamed of getting more.

While the stock is denominated in the certificate as preferred, the *dividend* named in it is not called preferred. It is simply described as the yearly dividend, payable in each year, out of the yearly profits and limited to four per cent, that the *stock is entitled to.* That it is to get it in priority to the common stock constitutes the preference. The words "not exceeding" do not create the preference and are not needed to limit it. The statement of the amount of a preference *per se* limits the preference, and the only necessity for the use of those words must be found in the intention to limit the total amount of the dividend that should be paid in any one year upon that stock. They were inserted by lawyers of known skill, and to impute any other meaning to the words would be to charge those lawyers with a want of knowledge of the use of language.

If the dividend had been specified as a preferred dividend the intention to have some other dividend in addition might be argued. It was not so called, however, and it was the *yearly dividend* to which that stock was entitled, that was defined and limited in the certificate. The final clause defined the preference, and so performed its only office. To make it do more would create a contradiction in the terms of the certificate ; set aside the carefully drawn description and limitation of the *"yearly* dividend" to which the stock was entitled ; and

invade the reserved rights of the stockholders who assented to the new issue; without a scintilla of proof of any such intention, upon a mere theory of what should be the rights of holders of formative stock in the absence of any agreement.

To accomplish this the plaintiffs first ignore the words of negation found in the certificate and then argue upon the effect of their absence. They will not see that the "yearly" dividend to which the stock is entitled, in each year, is four per cent and no more, and that the dividend so limited must be paid before the holder of the common stock receives anything.

The text writers relied upon, however, were obviously dealing with "formative" stocks only, in their suggestion of the supposed equal rights in further dividends, and while Cooke does give a form of certificate intended to prevent doubts and exclude further participation, he also gives another to exclude doubts and secure further participation. Neither form was used here, and no argument can be based on the absence of the one which will not apply with equal force to the absence of the other.

The argument that no sane man of business would have paid face value for the new stock unless it had rights in excess of four per cent will not stand examination. This Court is not revising but construing the agreement that was made, and there is no proof that anyone paid face value for the preferred stock. They swapped the old for the new securities and the then value of the one was the price of the other. For every B. & O. bond in it named, new bonds of the same or greater amounts were given, with various quantities of preferred and common stock thrown in for good measure. For the old preferred stocks, new stocks were given, while the rate paid by the syndicate for what it took is no where stated. They knew, however, exactly what they would get and they have not complained of their bargain. It may, therefore, be assumed that they took proper care of their own interests, like sane men of business, by buying upon the basis of the least desirable construction that could be placed upon the

legal rights or the earning capacity of the new stocks. It may be likewise assumed that the plaintiffs, so ably advised, bought upon the basis of a limited dividend in the hope of bettering their bargain and selling, if need be, upon the basis of their present contention.

The plaintiffs purchased after the certificates had been framed and issued and dividends declared and as their bills filed immediately afterward show, were informed of the action and construction placed upon them by the company. They were not ignorant or misled, but received exactly what they bought, accepting the stock as a satisfactory delivery from their vendors and waiving all claims against the latter arising from the form of the certificate. They voluntarily and deliberately bought into a situation that had been already made, and have no standing to complain against their own vendors, the reorganization managers, or Mr. Vorhees, much less against the railroad company or the common stockholders with whom they had no contractual relations. The plaintiffs stand upon those certificates as the foundation of these suits, and are bound by them. If they possess any rights clearly established by their terms, those rights should be, of course, protected, but it is submitted that this Court is not required to stretch those rights by theory or implication beyond the manifest understanding of the business world, to the injury of the common stockholders or of the company in whose prosperity all the stockholders are deeply interested.

*Victor Morawetz* filed a brief for Salomon *et al.* as voting trustees.

The voting trustees do not appear partisans of either contention; they desire to represent the interests of the holders of both classes of voting trust certificates with strict impartiality. They have therefore instructed their counsel to submit their views to the Court to the end that the interests of the holders of the common stook trust certificates, as well as those of the holders of the preferred stock trust certificates may be fairly presented to the Court.

The preferred stock was not issued under any statutory provision authorizing the creation of preferred stock. The validity of the preferred stock and the rights of the holders thereof rest wholly upon the agreement of the stockholders set forth in the stock certificates and in the resolutions of the stockholders adopted April 11th, 1899, which are referred to in the stock certificates. These resolutions of the stockholders in terms refer to the resolutions of the directors adopted April 10th, 1899, and provide for the issue by the company of "its four per cent non-cumulative preferred stock," in accordance with the propositon made by Frederick P. Voorhees. The stock certificates, the resolutions of the stockholders and of the directors, the proposition of Frederick P. Voorhees, the petition of the railroad company to the Circuit Court of the United States for the District of Maryland, the order of the Court made thereon, the voting trust certificates, the agreement under which these certificates were issued and the plan and agreement of reorganization, are all connected by cross references and must be construed together in determining the rights of the preferred stock.

It is important to approach the consideration of the question in controversy from the correct point of view. The plaintiffs apparently assume that the question is whether the special agreement respecting the dividends on the preferred stock *deprived* the holders of the preferred stock of certain dividend rights which they possessed as stockholders. This certainly is not the correct point of view. The holders of the preferred stock never were holders of common stock ; they did not become stockholders and did not acquire any rights as stockholders until their stock was created pursuant to the plan of reorganization. The burden is not upon the defendants to show that the special agreement respecting the dividends on the preferred stock has deprived the holders of the preferred stock of a right to receive dividends equally with the holders of the common stock. The holders of the preferred stock never possessed any such right. The burden rests upon the plaintiffs to show affirmatively that the preferred stock con-

ferred upon them the dividend rights which they now claim. The question is not whether the agreement respecting the dividends on the preferred stock deprived the holders of preferred stock of certain rights. *The sole question is : What dividend rights were intended by the plan of reorganization, by the resolutions of the stockholders and directors and by the stock certificates to be conferred upon the holders of the preferred stock ?*

In determining the legal effect of the agreement respecting the dividend rights of the holders of the preferred stock, the intention of the parties certainly is the controlling consideration. No technical or arbitrary rule of construction can be applied. The only question is : What was the intention of the parties as indicated by their agreement embodied in the stock certificates and in the resolutions and other instruments therein referred to ?

Applying the rule of logic and construction *expressio unius est exclusio alterius* to the present case, it would follow that the statement in the contract that the holders of the preferred stock are entitled to certain defined dividends must be deemed as a statement of the entire measure of their dividend rights.

If the intention had been that the holders of the preferred stock should receive dividends up to four per cent before the' payment of any dividends on the common stock and that they should receive further dividends *pari passu* with the holders of the common stock, no meaning or effect can be attributed to the words, " but not exceeding " in the stock certificates. It is a familiar rule of interpretation that, if possible, effect should be given to every word of a written instrument and that no construction should be adopted which would render any word or phrase inoperative.

The weakness of the plaintiffs' contention is apparent from the fact that the plaintiffs are unable to assert definitely what dividends they claim in addition to those which the stock certificates say they are entitled to. If the addition of the clause " before any dividends shall be set apart or paid upon the common stock " has the effect claimed on behalf of the plaintiffs, then the questions would be presented : What amount of divi-

dends must be declared upon the common stock in order to entitle the holders of the preferred stock to additional dividends? Are the holders of the preferred stock to receive additional dividends if one-half per cent or one per cent be declared on the common stock? What rate of dividends are the holders of the preferred stock to receive if they are entitled to any dividends in excess of four per cent? The plaintiffs themselves confess their inability to answer these questions by asking for alternative relief. It is inconceivable that the parties drafting the plan of reorganization and the stock certificates should have left these questions open if they had intended that the holders of the preferred stock should in any event receive dividends in excess of four *per centum per annum*.

PAGE, J., delivered the opinion of the Court.

The main question presented in the two cases contained in these records involves the right of the preferred stockholders of the Baltimore & Ohio Railroad Company to share in the distribution in the net profits of the company that may be remaining after the appropriation of four *per centum* of the net earnings to the preferred stock. It is contended by the appellants that the preferred stockholder has not only the right to receive a dividend of four *per centum* out of the net earnings before any dividend shall be set apart for the common stockholders, but to share *pro rata* with the common stockholders in the distribution of the residue; or, as an alternative proposition, to share equally with the holders of the common stock in any part of the net earnings that may be distributable after the payment of a dividend of four per cent each to the holders of both common and preferred stock. The legal title to both kinds of stock, is now vested in trustees who hold it for five years, or for an earlier date in their discretion, with such powers and duties as are particularly described; and they have issued to the real owners of the shares "certificates of beneficial interest," which entitle the said owners to receive stock certificates for their shares when the time the said trustees are to hold it shall expire, and in the meanwhile to receive payments equal to the dividends collected by the trustees.

The persons holding these "certificates of beneficial interest" are therefore the real owners of the stock and for the purposes of this opinion we may so regard them.

The question as to the relative rights of these two classes of stock cannot be answered by regarding only the characterization of one of them as "preferred;" because of the fact that this term, standing alone, means only a stock that differs from other stock in having a preference of some sort attached to it, without expressing the special nature of the preference.

Ordinarily the term "preferred stock" is understood to designate such stock as is entitled to dividends from the income or earnings of the corporation before any other dividend can be paid. 1 *Cook on Stockholders*, sec. 267; *Henry* v. *Great N. Railway Co.*, 1 De G. & J. 606. But though this may be true, yet to determine in each case the special properties and qualities it possesses, resort must be had to the statute or contract under which it was issued. "Preferred stock takes a multiplicity of forms according to the desire and ingenuity of the stockholders and necessities of the corporation itself." It is a matter of contract *Cook*, section 269, or depends upon statute. *Heller* v. *Marine Bank*, 89 Md. 611.

It always, however, represents *pro tanto* the capital of the company, and has about it no elements or rights other than those that are conferred upon it by the statute or contract to the authority of which it owes its existence. In all other respects the preferred stockholder is upon the same footing as the common stockholder; he is not a creditor of the company; his stock represents the amount of his ownership in the capital; he may vote at the meetings of the company as the common stockholders may do, and in general terms do and perform such things and be subject to such obligations as the common stockholders are subjected to, except as the terms under which his preferred stock was issued, may preclude. *Macintosh* v. *Flint, etc., R. R.*, 34 Fed. Rep. 582; *Re Barrow, etc.*, 59 L. T. R. 500.

The rights of the preferred stockholders are in the same manner limited or extended. The preferred dividends may be

made cumulative or non-cumulative; the dividend may be a fixed amount for each year to be paid out of earnings, or it may be a percentage, not exceeding a certain amount to be determined by the directors at their discretion; and the preferred stockholder who has received his preferred dividend may still have a share of the net earnings that may remain. These are all matters for the determination of which the statute or contract must be looked to. The whole doctrine on this subject was summed up in a few words by the LORD CHANCELLOR, when he said, in the case of *Henry* v. *The Great Northern Railway Co.*, 1 DeGex & Jones R. 636: "The expression 'preferred shareholder' is equivocal. It by no means clearly indicates what are the rights of those to whom it applies. I do not think it can fairly be said to be an accurate expression, whichever of the two constructions be put upon it. All which the language fairly imports is, that some preference is given to the persons to whom the language applies. How far the preference is to extend must be ascertained by other media than the mere expression itself." *Heller* v. *Marine Bank* (*supra*), 89 Md. 610; *State ex rel., Thompson* v. *C. & C. R. R. Co.*, 16 S. C. 530; *Warren* v. *King*, 108 U. S. 389; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159; *Elkins* v. *Camden & A. R. R.*, 36 N. J. Eq. 236; *Gordon's Extr.* v. *R. F. & P. R, R.*, 78 Va. 501.

The solution of the question with which we are now dealing must depend therefore upon the construction to be placed upon the agreement of the parties as expressed in the stock certificates. That must be taken as the embodiment of the contract, and the final expression of the entire measure of the dividend rights of the parties. *Greer* v. *Van Meter*, 54 N. J. Eq. 270. Evidence therefore of negotiations which proceeded this final consummation of the agreement, or conversations as to the intentions of the parties, cannot be accepted, for the reason that all these are merged in the written instrument which must be taken to express the final intention. *Bailey* v. *R. R. Co.*, 17 Wallace, 96; *Cassard* v. *McGlannon*, 88 Md. 168; *Lazear* v. *Nat. Union Bank*, 52 Md. 78.

But evidence of the situation of the parties, the objects and

purposes for which the agreement was made, and, in a case like this, when it is important to decide whether the certificate contains the whole agreement, all the agreements and resolutions which preceded and authorized the issue of the stock, may be resorted to for the purpose, not of altering the contract, but of arriving at the real intention of the parties as expressed in the written contract. 1 *Cook on Stockholders*, sec. 269, and authorities cited in note. In *Boardman* v. *Lake Shore & M. S. Railway Co.*, 84 N. Y. 173, the Court said : "We think the whole proceeding relating to the issue of the stock may by taken in consideration as constituting one and an entire transaction. The resolutions were competent evidence to show authority to issue the stock ; the proposal and other proceedings to carry out the purpose of the resolutions and the certificate as evidence of what stock was actually issued, and in part the terms upon which it was so issued. Altogether these papers evince what the intention was." *St. John* v. *Erie Ry. Co.*, 10 Blatch. 271; affirmed in 22 *Wallace*, 136; *Rogers* v. *N. Y., etc., Land Co.*, 134 N. Y. 197; *B. & O. R. R. Co.* v. *Brydon*, 65 Md. 216; *Chicago, etc., R. R. Co.* v. *Denver & C. R. R.*, 143 U. S. 596; *Mumford* v. *Memphis & C. R. Co.*, 2 Lea, (Tenn.) 293; *First Nat. Bk.* v. *Gerke*, 68 Md. 456.

But apart from this general principle which seems to be well established as we have stated, it is not important in this case, from the fact that all the instruments of writing relied on are connected together by reference one to the other. The certificate "of beneficial interest" and the certificate of stock refer to the resolutions of the company adopted on 14th April, 1899 ; these to the "proposition made by Mr. Voorhees," and this to the plan and agreement of reorganization, etc. So that a purchaser of a certificate of stock or of "beneficial interest" therein has had full notice of all these instruments of writing. They should therefore be regarded as instruments *in pari materia*, and may be resorted to to ascertain with precision whether the parties intended that the whole contract should be and was embodied in the certificate of stock. *Bailey* v. *Hannibal, etc., R. R. Co.*, 17 Wallace, 96.

Having thus stated some of the general rules applicable to the matter before us, we will now proceed to examine the facts. The Baltimore & Ohio Railroad Company was incorporated by the Act of 1826, ch. 123 of the General Assembly of Maryland. By the second section of the Act its capital stock was fixed at $3,000,000 in shares of $100 each, and by the 13th section, it was provided that if that proved insufficient for the purpose of the Act, it was made lawful for the President and Directors, etc., from time to time to increase the number of its shares, as they might deem necessary. This power was exercised from time to time, so that, when the company went into the hands of receivers in 1896, there were outstanding, of common capital stock to the amount of $25,000,000, par value. The first issue of preferred stock, made under the Act of 1835, ch. 395, was of $3,000,000, par value, to the State of Maryland. By the terms of the ninth section of that Act, the State as the holder thereof was entitled to receive "a perpetual dividend of six *per centum per annum*, out of the profits of the work as declared from time to time, and no more, etc." The second preferred stock amounting to $2,000,000, was issued under the Act of 1868, ch. 471. This Act was amended by Act of 1880, ch. 474, and now remains in the Code as sec. 294 of Article 23.

The holders of this stock are entitled to "a perpetual dividend of six *per centum* and no more." So that in 1896 the capital stock of the company was:

Of common stock. . . . . . . . . . . . . . . . . . . . . . . . . $25,000,000
Of preferred stock under the Act of 1835... .... $ 3,000,000
Of preferred stock under Act of 1868. . . . . . . . .     2,000,000
                                                         _____

        Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . $30,000,000
                                                         _____

In 1896 the company became insolvent, and in February of that year was placed in the hands of receivers appointed by a decree of the Circuit Court of the United States for the District of Maryland.

The aggregate amount of the company's obligations, se-

cured by mortgages and otherwise, or non-secured, were very large, and amounting to many millions, and during the three years of the receivership the amount of obligations was increased by the issuance of receivers' certificates which became liens on the road and its earnings to the extent of over five and half millions of dollars. In June, 1898, a plan for the reorganization of the system was devised by a committee created for that purpose.

It is impossible to examine this plan (a copy of which is to be found in the record) without being impressed with the business skill of its framers. It was manifestly intended and seems to be, a comprehensive document, which should cover every possible contingency that a careful examination and much intelligent thought could suggest. There is apparent a most thorough and exact knowledge of the affairs of the company and a full appreciation of the magnitude of the interests with which they proposed to deal. It is most carefully and skillfully devised and was formulated into words and phrases evidently by some one who was expert and intelligent in the performance of such work. Its aim, as is set forth in its provisions, was to prepare a plan for reorganization which should not only bring the fixed charges within the earning capacity of the road, and secure the payment of the floating debts and existing obligations, but also to provide "adequate capital," for the "present and *future* requirements of the road." When it is borne in mind that the problem before them involved the adjustment upon just and equitable principles of the various, and doubtless conflicting interests of many persons, the complicated and multifarious relations of the properties of other companies and the combination of all these varied interests in one harmonious plan, it is difficult to conceive how in one of its most important features there should have been left anything to construction. The plan provided for contemplates the issue of three kinds of securities with which the old indebtedness was to be settled for; viz:

1st. $70,000,000, prior lien 3½ per cent gold bonds, due 1925.

·2nd. $63,000,000, fifty year four per cent gold bonds.

3rd. $40,000,000, four per cent non-cumulative preferred stock.

4th. $35,000,000, common stock.

.Each of these several securities and the purposes of their creation, and how they are to be applied, etc., are carefully described in the plan.   It is also provided that no additional mortgage shall be put upon the property and no increase in the amount of the preferred stock, except with the consent of both classes of stock, voting separately.   Is it within the bounds of reason to suppose that if it was intended that this large amount of preferred stock was to have the right, to the great injury of the common stock, to share in the surplus of net profits remaining after it has received its four *per cent* div- · idend, that these careful business·men would not have had it definitely so expressed in the plan?   There was nothing in the condition of the law that could have warranted the omis-· sion.   Whatever Courts may hold eventually as to the right of ordinary preferred stock to share in the residue of net earnings after its preferred dividend has been received, the maintenance of that right in the absence of anything in the·contract creating such preferred stock, so far as we are informed, has not yet been taken by any court.   No decision holding this has been furnished us by the very able and industrious counsel who argued this case for the appellant, and we have found none ourselves.   It is true that some of the text writers do intimate that such may be the law, but the cases cited are those where there is express provision for the participation in the surplus, and fall far short of sustaining the proposition by which the appellants here seek to impose the additional quality upon the preferred stock.   One of these cases is *Bailey* v. *Hannibal, etc., Railway Co.*, 17 Wallace, 96.   There it was expressly provided that after the preferred dividend the stock should be entitled to "an equal dividend with said other shares," etc.   A like provision is to be found in the other case cited.   *Allen* v. *Londonderry, etc., R. R. Co.*, 25 W. R. 524.

So that there is no room here for the argument that in de-

claring the rights of the preferred stock it was not necessary to state particularly that it should have such attributes, because of the reason that under well settled principles of law it is entitled *proprio vigore* to such participation. And although it were conceded that the right of the preferred stockholder, after he has received his preferred dividend, to participate in the surplus net earnings can be supported by cogent reasoning, yet in a case like this where so much exactness of detail is observable in the plan, where the interests involved are so great, and where the proposition of law has not been definitely settled but lies in the mind of each person as he may reason out the matter for himself, it would be most unreasonable to assume that when the schedule for the issue of $40,000,000 of preferred stock was included in the plan, everything was not then put there that the parties intended should be there. It was necessary, in the highest degree, that each class of new issues should be properly described. The description of the new mortgages and the total amounts they were to cover was carefully complete. As to the common stock, it was not necessary that its characteristics should be stated for they were definitely fixed by law. But it was supremely necessary in reference to the preferred stock, to make such description of it as would clearly inform its holders of just what rights would attach to its ownership. It was necessary to state that it was to be non-cumulative and entitled to a preference dividend not exceeding four per cent, otherwise it would have stood on the same footing as the common stock. The holders of practically all the shares of capital stock deposited their securities and accepted the new stock, whereby they "assented to" the issue of the preferred stock and are not now in position to object to the validity thereof. It is clear that the new stock was issued, not under any statute specially authorizing such issue, but solely under the general power of the corporation to issue such stock as all of its stockholders shall direct to be issued, that is by the express agreement of all of its stockholders. To construe this express contract, as set out in the certificate, when read in connection with the resolutions of the

directors of April 11th, 1899, and the other papers referred to directly and indirectly in the resolutions, as being incomplete and fragmentary, so that its true meaning cannot be ascertained without reading into it provisions that are, at least, doubtful in law and certainly not sustained by any proof in the case, would do violence to the principles applicable to the construction of written instruments, as have already been herein set forth.

Is there anything in the language employed in the certificate which should require a different construction than that we have given to it. The contract as set forth in the certificate of the preferred stockholder, is: "The holders of preferred stock to the amount now issued and such additional amounts as may be lawfully issued from time to time by the President and Directors of the Company, pursuant to the resolutions of the stockholders duly adopted April 11th, 1899, are entitled to receive in each year, out of the surplus net profits of the company for the current year such yearly dividend (non-cumulative), as the Board of Directors of said Railroad Company may declare, up to, but not exceeding, four *per centum*, before any dividends shall be set apart or paid upon the common stock."

The certificate of the original preferred stock, issued under the Acts of 1835 and 1868, provided that the preferred stockholder should have a "perpetual dividend of six *per centum per annum* and no more," and it is insisted that the omission of the words "no more" is significant, as indicating the intention of the parties. But the case of the original preferred stock is different from the one with which we are now dealing. The pre-existing preferred stock was issued to conform to the requirements of the statutes of 1868 and 1835. Both of the statutes contained the words "no more," and it was perhaps proper that they should be there, so that the intention of the Legislature should be clearly expressed. Here the preferred stock was issued with the assent of all the stockholders and to carry out the plan of reorganization. It was the intention of all the parties that the new preferred stock

should be issued to carry out the plan of reorganization and that it should have such preferences, rights and attributes as were contemplated by the plan. There was no necessity, therefore, for the use of the words "no more," because by the plan and the resolutions of the company, passed April 10th, 1899, the preferred stock was to be "entitled to receive non-cumulative dividends at the rate of four *per centum per annum* before the payment of any dividend on the common stock, but shall have no lien upon the property of the company." The omission of the words "no more," therefore, we do not think is a matter of any significance whatever. The words of the plan, referring to the preferred stock, are as follows :

"$40,000,000 four per cent non-cumulative preferred stock *per annum* before the payment of any dividend on the common stock." If these be compared with the words contained in the certificate of the stock there will be found a slight difference. In the latter certificate it is provided that the preferred stock is entitled to receive out of the surplus such yearly dividend (non-cumulative) as the board may declare "up to, but not exceeding four *per centum* before any dividends shall be set apart or paid upon the common stock." Why were the words "not exceeding" thus inserted ? What is their significance ? If it was only to indicate that the four per cent was the largest amount that could be received before the common stock was entitled to a share of the earnings, the words 'up to,' would have been quite sufficient and the other words would have been surplusage. But we cannot neglect these words, for in construing a contract it is not to be presumed that words are lightly used, but each word should be given due weight. "A word not plainly inserted by accident or mistake is never to be thrown out entirely while there is a plain and natural construction which can be given to it not manifestly destructive of the general intent of the sentence." *Philadelphia* v. *River Front R. Co.*, 133 Pa. St. 134.

If it be conceded that the purpose of the certificate was to express what share of the net earnings the preferred stock was

to be entitled to, it is possible to give the words " not exceed-ing" some force, but not otherwise. The certificate would then mean, that it was to receive four per cent and nothing *exceeding* that proportion ; the said amount to be received be-fore any dividends be allowed to the common stock. Upon the hypothesis of the appellant that the whole purpose of the certificate was to declare what the preferred stock was entitled to, before the common stock would be entitled to receive any-thing, the words "not exceeding" perform no function what-ever. The certificate states what the preferred stock " will be entitled to receive ; " and that is, "not *exceeding* four per cent ; " that is the measure of its rights, and if so, how is it possible to hold that having received that amount before the common stock received anything, it shall yet receive afterwards, an additional sum ? According to the fair meaning of these words, it seems to be clear that a proper construction of them and the only one that will harmonize them all, is that the preferred stock should be non-cumulative and should receive four per cent and no more, out of the net earnings ; but should be en-titled to receive that before any dividends are set apart for the common stockholders.

It follows that the decrees must be affirmed in both cases.

> *Decree affirmed in No. 27 and No. 28,*
> *April Docket 1901, with costs in both*
> *cases to the appellee.*

(Decided June 13th, 1901.)