## STATUS OF PREFERRED STOCK ISSUED IN THE PURCHASE OF THE ASSETS OF ANOTHER CORPORATION.

Common Pleas Court of Cuyahoga County.

CLAUDE W. SHIMMON v. NATIONAL SCREW & TACK CO. ET AL.

Decided, April 19, 1916.

*Corporations—Dividends on Preferred Stock Limited to Those Prescribed in the Certificate—Not Invested With Profit Participating Quality of Common Stock—By Reason of Failure of Charter to Authorize an Issue of Preferred Stock—Acquiescence in the Provisions of a Contract—Meaning of the Word "Share."*

1. Where the entire assets of a corporation are sold to another company, and payment is made by issuing to the stockholders of the selling company shares in the purchasing company which are cumulative and preferred both as to dividends and assets, redeemable at any time at par with accrued dividends at the option of the purchasing company, the holders of said preferred stock have no right to demand a rate of dividend higher than that named in the certificate or to share in the dividends which are being paid on the common stock.

2. Absence from a certificate of incorporation of any provision for issuing preferred stock does not change the temporary character of preferred stock which may have been issued in payment for the assets of another company, or invest it with profit sharing qualities in addition to its interest bearing and preferential character.

3. Stockholders of a failing corporation, almost unanimously voting to sell its property to another corporation, accepting in payment thereof from the purchasing company preferred stock, having representation on the board of directors receiving notice and voting to issue stock dividends to the holders of common stock, and taking the stipulated dividends for several years, the preferred stock directors being present at all meetings of the board of directors and never objecting to such issues of stock dividends, thereby indicate that they construe the contract to be an acceptance of preferred stock with fixed though not participating dividends, and the purchaser of shares of such preferred stock from an original holder has no better or different rights to change the

temporary character of such stock to profit participating common stock.

4. The term, "share," as applied to corporate stock contains no magic to destroy the right of contract, or to make preferred stock with specific dividend limitations profit sharing when common stock is voted as stock dividends.

5. A certificate of preferred stock, expressing on its face a limitation of interest rate and providing for a fixed preferential cumulative dividend, is a contract for a dividend that can not be changed or passed by the corporation issuing it and which the holder must receive if profits are realized.

*Howell, Roberts & Duncan,* for plaintiff.
*M. P. Mooney* and *Tolles, Hogsett, Ginn & Morley,* contra.

FORAN, J.

Prior to January 1, 1908, there existed in the city of Cleveland two Ohio corporations, the National Screw & Tack Company and the Union Steel Screw Company, the outstanding stock of the National Screw & Tack Company being $1,000,000, and that of the Union Steel Screw Company being $542,500. The latter company was a going concern, but not operating to the satisfaction or benefit of those having capital invested therein. The former company was regularly paying dividends of 6 per cent. to its stockholders, and had assets exceeding all its liabilities, other than its capital stock, in the sum of $1,366,886, as found by accountants satisfactory to both companies.

About January 1, 1908, negotiations began or were had between the two companies, which resulted in an offer by the National Screw & Tack Company to purchase the plant and assets of the National Steel Screw Company for $461,125, to be paid in the preferred stock of the National Screw & Tack Company. This proposition was submitted to the board of directors of the Union Steel Screw Company March 13, 1908, and suitable resolutions were adopted providing for its acceptance. A printed notice, of date March 28, 1908, was accordingly mailed to each stockholder that a special meeting of the stockholders was called to convene at the office of the company April 30, 1908,

to consider the offer of the National Screw & Tack Company. Accompanying the notice was a printed letter bearing the signatures of all the members of the board, giving in detail the proposition of the National Screw & Tack Company that has been tentatively approved and accepted by the board of directors of the Union Steel Screw Company. In this letter the stockholders were informed that all the directors of the Union Steel Screw Company, subject to the approval of the stockholders, had unanimously authorized a contract providing for the sale to the National Screw & Tack Company of all its property of every kind and description, including good will, for the sum of $461,125, payable in 6 per cent. cumulative preferred stock of the National Screw & Tack Company, and the issue of preferred stock was to be limited to said $461,000, redeemable at any time at par with accrued dividends, at the option of the purchasing company or issuer of the stock, the stock to be preferred both as to dividends and as to assets. The stockholders were further advised that if the contract was approved, dividends would be paid semi-annually, and that they would realize 85 per cent. on their present holdings, or an amount that would net them an income of five and one-tenth per cent. on their present holdings; and that if the arrangement was consummated, preferred stock would be represented by net assets of the National Screw & Tack Company exceeding in value three and one-half times the par value of the preferred stock. The stockholders were also advised to approve the proposition, for the reason that by the consolidation there would be economy in operation and reduction in cost of output.

At this time the National Screw & Tack Company was engaged in other profitable lines aside from the manufacture of screws or wood screws, and the stockholders of the Union Steel Screw Company were informed in the letter of March 28, 1908, that, "while the directors of the Union Steel Screw Company have been endeavoring for the last two years to take on other lines of manufacturing business, they see no prospect of engaging in anything which will warrant the investment of the necessary capital."

Because of these facts, they cordially recommended the acceptance of the proposition or proposed plan.

At the stockholders' meeting of April 30, 1908, there were 4800 shares represented, out of the entire issue of 5425 shares of stock; and upon the ballot and canvas it appeared that 4800 shares voted in favor of accepting the offer and proposition of the National Screw & Tack Company, and no shares voted against it.

Thereupon the National Screw & Tack Company proceeded according to law, and, in compliance with the agreement, increased its capital stock and issued to the shareholders of the Union Steel Screw Company, in proportion to their holdings, 4610 shares of 6 per cent., cumulative, preferred stock; and, increasing its board of directors from seven to nine, elected two of the preferred stockholders to represent these shareholders on the board, upon which board they have had like representation continuously.

Before this issue of prefered stock, the National Screw & Tack Company had only common stock; and in its articles of incorporation there was no provision for preferred stock. Both common and preferred shareholders have been paid 6 per cent. in dividends on their investment since the date of the absorption of the Union Steel Screw Company. Stockholders' meetings have been held regularly every January or February. At the stockholders' meeting of January 19, 1911, there were present and voting 8823 shares of common and 3831 shares of preferred stock. A resolution was unanimously adopted providing for an increase of $250,000 of common stock, for the purpose of distributing a 25 per cent. stock dividend to the common stockholders. Similar action to declare a stock dividend of 20 per cent. to the common stockholders was taken January 15, 1913. The necessary legal measures to effectuate these distributions of stock dividends to common stockholders were taken, and stockholders' meetings called as required by law. At all these meetings the preferred stock was well represented, and no objection was made to such distribution of stock dividends.

On January 19, 1916, the board of directors declared its purpose to issue or declare a further stock dividend of sixteen and two-thirds per cent. to the common stockholders.

To these distributions and to the proposed distribution of stock dividends no objection has been made or protest entered by any of the persons to whom the preferred stock was originally issued; nor have the directors representing the preferred stockholders on the board ever objected to or protested against these issues, or taken action of any kind to prevent them. At the stockholders' meeting of the Union Steel Screw Company on April 30, 1908, which approved the sale to the National Screw & Tack Company, one man represented, and perhaps largely controlled, ten-thirteenths of all the stock of the Union Steel Screw Company. This gentleman is now and has been a member of the board of directors of the National Screw & Tack Company from the date of the absorption. The minutes of the corporation disclose that he has been almost invariably present at board meetings. He was present at every meeting which declared a stock dividend to common stockholders, and invariably voted in favor of such distribution of stock dividends.

On November 22, 1915, the plaintiff claims he purchased five shares of this preferred stock, and that the same was duly transferred to his name on the books of the company on January 22, 1916. He brings this action, as stated in the brief of his counsel, ''to compel the company, in the distribution of the stock dividend declared on January 19, 1916, to recognize the preferred stock, and distribute said dividend equitably as between preferred and common stockholders.'' In the prayer of his petition he asks for an accounting and disclosure, with a view to equalizing dividends upon both preferred and common stock, and asks that the company be enjoined from proceeding as proposed by its board of directors in January, 1916.

The declaration of claim for relief, as outlined by counsel in their brief, will only be considered, including, of course, the prayer for injunction. There is, then, but one question presented, and that is: Have the preferred stockholders of the

National Screw & Tack Company, in view of all the circumstances herein stated, and in view of the construction they have placed upon the contractual relations existing between them and the defendant, a right to demand, by way of dividend, more than the 6 per cent. provided for in their stock certificate?

In many instances the mere statement of a proposition unerringly points to the answer raised by the issues involved therein. We think the case now before the court falls into this class; and if the answer is not pointedly suggested by the facts as recited, it is because there is lack or want of clarity of statement by the court or a poverty of language to so paint a word picture that a label to identify it would be wholly unnecessary.

As shown by the stock certificate, the preferred stock was entitled to the following rights, privileges and preferences over the common stock:

(a)    The annual, cumulative, 6 per cent. dividend.

(b)    In case of dissolution or liquidation, the preferred stock and accrued unpaid dividends shall be paid in full before the common stock, from assets remaining after liquidation.

(c)    The authorized preferred stock, $461,000, shall not be increased, nor shall the company's property be mortgaged, without the consent in writing of the holder of at least three-fourths of the preferred stock, or by like vote at a metting of the preferred stock called for that purpose.

(d)    While the company reserved the right to redeem the preferred stock at any time at its own option, such redemption must be in cash at par, plus accrued dividends, and no less than the whole of said preferred stock shall be redeemed at any time.

(e)    No dividends shall be paid on the common stock, or declared thereon, so long as any dividends are accrued and unpaid on the preferred stock.

With two representatives on the board of directors, to aid in shaping the policy of the company, and keep in touch with its activities, the holdings of these preferred stockholders are as secure as any investment of capital can be under modern industrial conditions.

The Union Steel Screw Company was engaged in but one line, the manufacture of wood screws. The panic of 1907 evidently resulted in curtailment of orders and loss of profits. The directorate, after a calm survey of the situation, concluded to "cast anchor to windward" and save, if not a sinking ship, at least one that was unable to breast high-water conditions then prevailing in the financial ocean. Under these circumstances the corporation concluded to sell its plant and assets, including good will, rather than continue in business upon a plainly foreseen possibility of bankruptcy. The stockhoders, however, took every possible precaution to secure the ultimate payment of the amount agreed upon, as well as to secure a reasonable rate of interest upon this amount. The provision that the preferred stock might be redeemed at any time, at the option of the purchasing company, clearly indicates that this stock was to be temporary and not permanent. The statutes of this state undoubtedly contemplate that preferred stock may be of a temporary character. The holders thereof are in fact stockholders, and not creditors (*Miller* v. *Ratterman,* 47 Ohio St., 141). Yet where the right to redeem the stock is reserved, the reservation is based upon its temporary character, and is made as a check against the advantages conferred upon it. In the case before us it will be admitted that while the issue of preferred stock increased the capital stock of the National Screw & Tack Company, still it retained in large degree the character and quality of the original indebtedness which it extinguished (*Mannington* v. *Railway,* 8 O. L. R., 451). And by virtue of the statutes, or charter and regulations, every Ohio corporation contracts with its stockholders to pay them their pro rata shares of dividends or profits actually earned, and, upon liquidation, their pro rata share of assets remaining after payment of debts. The rights of preferred stockholders are, of course, a matter of contract. When it becomes necessary to determine the precise nature and character of this contract, the whole course of proceeding relating to the issue of stock may be considered as bearing upon the intention of the parties.

The situation, as stated, at the time negotiations between these corporations began, the action taken by them, the letter of March

28, 1908, to the stockholders of the Union Steel Screw Company, the resolutions passed at the stockholders' meeting of April 30, 1908, and the stock certificates, constitute, in our opinion, one and an entire transaction (*Boardman* v. *Railway*, 84 N. Y., 157). In other words, the stock certificate does not contain or evidence the whole of the agreement, and we may look to the situation of the parties, the surrounding circumstances and all action taken to ascertain the real intention of the parties as expressed in the stock certificates of the preferred stockholders (*Scott* v. *Railway*, 93 Md., 475) ; and this is merely a statement of the general rule of construction.

Where the intention of the parties to a contract is not expressly stipulated in the instrument itself, or if there is any doubt as to the intention of the parties, the court, in attempting to arrive at the meaning and intention of the parties, should give great weight to the acts and conduct of the parties, and to the construction and interpretation by them placed upon it for many years continuously after it had been entered into with full knowledge of the questions involved; and it should receive this interpretation, though it may still be opposed to the natural and ordinary meaning of the language used. *Cincinnati* v. *Gas L. & C. Co.*, 8 C. C., 429.

It has been generally held in this state, "where the language of a contract is ambiguous," or the intention of the parties not clearly stated, that "it is proper for the court to consider the interpretation and construction that the parties themselves have placed upon it, as evidenced by what they have said and what they have done." *M. E. Church* v. *Water Co.*, 20 C. C., 578.

It is undoubtedly true, as stated by *Cook, Corporations*, Section 269, that "a share of stock is a share of stock, whether preferred or common;" but admitting this to be true, it nevertheless must be conceded that the preferred stockholder may, by contract, waive many if not all of his rights of supervision or participation in profits or dividends in excess of those stipulated in the stock certificate. It is insisted, however, that it was clearly the legislative intent, as expressed in the statutes, that

preferred stock should stand on the same footing with common stock, except as it is restricted or limited by the terms of the charter. This claim is predicated upon the assumption that, inasmuch as there are no restrictions or qualifications placed upon the preferred stock in the certificate of incorporation, as provided in Section 8669, G. C., it follows that the National Screw & Tack Company did not intend to limit the dividends of the preferred stockholders to 6 per cent. Counsel evidently seem to forget that when the National Screw & Tack Company was first organized, its certificate of incorporation did not provide for an issue of preferred stock. Its promoters were evidently not under the necessity of using this means of raising the necessary capital for their enterprise. To create discriminations, preferences, restrictions and qualifications upon preferred stock, the articles of incorporation would have to be amended, as provided by Section 8719, G. C., and then only by a three-fifths vote of the stockholders; while the capital stock might be increased by a majority vote of the stockholders, as provided in Section 8698, G. C. Again, the corporation could not increase its capital stock by amendment to its articles of incorporation, as such increase must be made as provided in the latter section.

There is no evidence before the court as to meetings, resolutions and votes thereon of the National Screw & Tack Company relating to the negotiations and purchase of the assets of the Union Steel Screw Company. Whether the purchasing company could secure the requisite vote to amend its articles of incorporation, or not, we are not advised. However, it does not follow that, because it failed to make such amendment, it did not intend to limit the right of the preferred stock to the dividends named in the certificate. The fact that it issued stock dividends only to holders of common stock in 1911 and in 1913, and now again proposes to do so, and the fact that the preferred stockholders not only acquiesced in these distributions, but, through their representatives on the board, and they personally at stockholders' meetings, voted for such distribution, is not only significant of intention, but conclusive evidence that

the understanding and agreement was that the preferred stock was to be limited to 6 per cent. in distribution of dividends. It must be remembered that this preferred stock was not issued, as is usually the case, to provide additional capital, but was really issued to pay a debt. The obligations of the National Screw & Tack Co. were increased, for it should not be forgotten that it was taking over a failing concern. The status of the stockholders of the Union Steel Screw Company was vastly improved by the sale of their plant. Thereafter their investment was not only secured, but they were guaranteed a fixed income on it—fixed in the sense that it could not be varied by profits. They held practically one-third of the capital; and if the corporation made but 2 per cent. profit a year, it went all to them. Not only that, but if there were a failure to make or realize profits for two years, and 6 per cent. were realized the third year, the whole of it would be absorbed by the preferred stockholders.

Again, the corporation could not redeem this stock by calling in portions of it to suit its convenience. No part less than the whole could be redeemed. No more preferred stock could be issued, nor could the company's property be mortgaged without their consent. In the event of liquidation, they had first lien on remaining assets. They took no chances. The common stock took all the chances of financial panics, falling markets, and the squeezing, crushing force of industrial competition.

We must presume that both parties fully comprehended and understood this situation and its possibilities, and that the agreement and understanding was, that the preferred stock should receive the dividend provided in the certificate, and that only.

Aside from this phase of the case, we believe the contract, as expressed on the face of the certificate, does limit the rights of the preferred stock to a 6 per cent. dividend. These certificates provide for a fixed, preferential, cumulative dividend at a reasonable rate; and this, in common fairness, should, if it actually does not, negative any right to further participate in profits. The preferred shareholder contracts for a dividend

that the other party to the contract can not change or alter, and which the preferred stockholder must receive if profits are realized. If dividends are earned or profits made, this fixed dividend must be paid. Nor can this payment be passed, as is frequently done with respect to common stock dividends. It is wholly a matter of contract and barter; and we believe that no rule of construction is violated by holding that the entire contract, the whole of it, is expressed in the certificate. To sustain the view of counsel for plaintiff, we must read into the contract language conferring rights and privileges not therein stipulated. The common understanding among men who promote and manage corporations has always been that the preference in preferred stock is given to it by the contract and resolution creating it, and no more; and these rights and preferences are stated in precise and exact words in the certificate, and ought not to be enlarged by holding that there is some magic in the word "share" that even the right of contract can not destroy. When the preferred shareholder receives all that he contracts to receive, and all the corporation agrees to give him, it would seem by every rule of legal exegesis that his right is terminated. There are some authorities which hold otherwise. See *Sternbergh* v. *Brock*, 225 Pa., 279; *1 Cook, Corporations,* Section 269; *Beach, Priv. Corp.,* Section 501; *4 Thompson, Corporations,* Section 3603; *Couse, Ohio Priv. Corp.,* p. 15.

It will be noticed that these authorities, if they may be so termed, are, with but one exception, text-writers. The weight of authority and reason, however, is that preferred stockholders are limited in the distribution of dividends to the amount specified in the stock certificate. See *Niles* v. *Valve Co.,* 196 Fed. Rep., 994, affirmed, *Niles* v. *Valve Co.,* 202 Fed. Rep., 141. See also, *Palmer, Precedents,* p. 814; *Will* v. *Plantation Co.,* 107 Law T. Rep., 360; affirmed in the House of Lords, 109 Law T. Rep., 754. This latter case, decided finally October, 1913, seems to be the latest utterance upon the subject, and presents by far the most illuminative and conclusive reasoning. There are no Ohio authorities upon the subject, and we think for the

reason that no preferred stockholder ever believed that he had a right to participation in dividends other than as declared in his stock certificate, and that he was limited to the amount therein named. The reasoning in support of the contrary opinion is based wholly upon Cook's dictum that ''a share of stock is a share of stock, whether preferred or common.'' See *Cook, Corporations,* Section 269. A horse is a horse, whether gray or black, but each may have its limitations, each may have attributes wholly peculiar to itself. While both are generically alike and have many attributes in common, yet specifically they may be vastly different in power, speed, character and disposition. There is no argument or reason in Cook's dictum. It is only dictum in the sense that it is not the professed, deliberate determination of a court whose judgment will stand the test of rigid critical analysis. A great deal has been said and written concerning the sacred rights of stockholders which modern legislation enacted for their protection has rendered obsolete and irrelevant.

For the reasons given, the prayer of the petition will be denied and the petition dismissed.