JAMES F. POWERS FOUNDRY COMPANY *v.* THOMAS B. MILLER ET AL.

THOMAS B. MILLER ET AL. *v.* JAMES F. POWERS FOUNDRY COMPANY ET AL.

[Nos. 35, 36, January Term, 1934.]

*Decided April 4th, 1934.*

The causes were argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*James F. Evans* and *Joshua Clayton,* for the appellant in No. 35, and the appellees in No. 36.

*Edward D. E. Rollins* and *William J. Bratton,* for the appellees in No. 35, and for the appellants in No. 36.

Sloan, J., delivered the opinion of the Court.

There are two appeals in this record, the first taken by the corporate defendant from a decree appointing receivers for it, the second taken by the plaintiffs from so much of the decree as dismissed their bill as against William Sterling Evans and Standley Evans, the appellees in No. 36.

On March 31st, 1933, the plaintiffs, Thomas B. Miller and William J. Fenton, filed a bill of complaint on behalf of themselves and such other holders of preferred stock of the James F. Powers Foundry Company of Cecil County as might join with them, praying the appointment of a receiver and a decree against William Sterling Evans and Standley Evans for such sums as they had received as dividends on the common stock of the corporation in excess of the rate of dividends paid on the preferred stock. Four others later were made parties plaintiff.

The James F. Powers Foundry Company, a corporation, owns and for many years operated an iron foundry at Elkton, in Cecil County, which for lack of business had suspended operations in 1931. It had a capital stock consisting of 419 shares of the par value of $100 each, of which 404 shares were preferred stock and 15 shares were common stock. William Sterling Evans and Standley Evans owned all of the common stock. The plaintiffs owned or held 180 shares of the preferred stock, and William Sterling Evans and Standley Evans and their relatives 213 shares. All of the shares, common and preferred, have equal voting privileges. Dividends at six per cent. were paid on the preferred stock every year from its issue in 1909 to July 1st, 1929, and none since.

From 1910 to 1925, both inclusive, twelve dividends, one of five per cent., six for six per cent. and five for five per cent., were paid on the common stock. In five of those years no dividends were declared. On October 26th, 1926, a dividend of 430 per cent. was paid, and on October 17th, 1927, and again on October 22nd, 1928, a dividend of 150 per cent. was paid on the common stock, and none since October, 1928.

It appears from the company's statement for the year 1926, the year in which it is charged that William Sterling Evans and Standley Evans acquired control of the corporation, that it had a surplus of $7,936 with the depreciated value of the building carried on the books at $16,539.46. At that time its financial condition was good. It had no bills payable, had $5,600 of government bonds, $11,500 cash, goods then inventoried at $5,000, and in January, 1927, this was augmented by $10,000, the proceeds of an insurance policy on the life of James F. Powers, who founded the corporation, which cost the company for premiums $3,753.30.

According to the agreed statement in the record: "When the Evanses gained control of the Foundry Company in 1926, said company was losing money. The new management increased the business temporarily, but it later fell off. For the year ending September 30, 1927, the operating account showed a loss. For the year 1928 the operating account showed a profit of $1,328.53 before payment of $2,424.00 in dividends on the preferred stock and $2,510 on the common stock. The operating loss for 1929 was $1,873.67 and for 1930, $1,226.73. In 1931 operation was at a loss." During the years 1926 to 1929, both inclusive, dividends at six per cent. *per annum*, amounting to $8,484, were paid on the preferred stock, and $10,950 on the fifteen shares of common stock, or a total in the four years of $18,434, or about $12,000 less than the amount of cash or its equivalent on hand by the end of January, 1927.

The company has not operated the foundry since 1931 and its financial condition is anything but strong. Its statement as of September 30th, 1932, shows assets of $33,290.12, and

liabilities $45,417.59, including $41,900 capital stock, and bills payable $3,517.59. Of the bills payable, $1,249.48 was due the Messrs. Evans on their salary accounts and substantially all of the balance for taxes. The item of real estate, exclusive of equipment, is carried in the 1932 statement at $25,000, and consists of the foundry property and a warehouse, not needed or used in the business, bought prior to 1926 and rented at $50 per month. Three witnesses testified to the value of the real estate. William Stephens, a builder, said the foundry building and ground were worth $35,000, and that $400 would put it in good repair. His estimate was based largely on the cost of reproduction, rather than on the market value. He valued the warehouse property at $3,500. Manley Drennen, who qualified as a real estate expert, gave the foundry building and lot a value of $20,000 and the warehouse $5,000. Charles P. Bartley, who also qualified, valued the foundry and lot at $25,000 and warehouse property at $4,000. All said there was no present market for the foundry and none of them included the equipment. Messrs. Drennen and Bartley said there was a market for the warehouse property at their estimates of its value. According to these witnesses, the value put on the real estate in the statement of September, 1932, was not excessive. What that statement does show is an impairment of the capital stock, but it does not show insolvency, though that might be the result if the property were now thrown on the market and disposed of at public auction; there being nothing less valuable than an idle factory building, no matter what it cost. The evidence is that the building has been kept in a fair state of repair, and, if conditions warrant, the foundry business can be resumed on short notice, and the company assume its corporate functions, which cannot be done if the plaintiffs have their way.

It is also charged, as a contributing factor toward the company's present condition, that William Sterling Evans and Standley Evans have been receiving excessively high salaries for services insufficiently or inefficiently rendered.

The joint salaries reached their maximum amount at $75 a week from July 28th, 1929, to May 13, 1931, reduced to $55 for four and a half months, and $50 a week from October 2nd, 1931, to September 30th, 1932, since which time no salaries have been charged and none are "expected". Of a balance of $2,550, $150 has been paid, and a worthless note held by the company for $1,735.44, accepted on account, leaving the balance heretofore noted.

This bill is filed, not by creditors demanding payment of their accounts, but by forty-three per cent. of the preferred stockholders, and then nearly five years after the commission of the last of the offenses complained of. "The acquiescence or consent of a shareholder for a long period of years in any given state of facts or conduct on the part of the corporate authorities, which he afterwards seeks to make the foundation for the appointment of a receiver, will generally prove a bar to the relief sought." *High on Receivers* (4th Ed.), sec. 295. If this is a controversy between stockholders, as it now appears to be, a majority of whom are in favor of holding the property for more favorable business conditions, the others demanding that the property be sold for what it may bring and the corporation dissolved, it means the wrecking of a business that has been and may again be successful. If the corporation can take care of the taxes, which seem to be the only claims which might become pressing, then the property of the company can be preserved at much less cost than by a destructive receivership. "Mere internal dissensions among stockholders, or mere differences or disputes as to corporate management, so long as the officers or stockholders do no act that is fraudulent, illegal, or *ultra vires,* will not warrant the intervention of a court of chancery, because, in the absence of fraud, illegality, or conduct that is *ultra vires,* the will of the majority is entitled to control the policy and the business of the body corporate." *Du Puy v. Transportation & Terminal Co.,* 82 Md. 408, 426, 33 A. 889, 890; *Callaway v. Powhatan Improvement Co.,* 95 Md. 177, 185, 52 A. 916; *Howeth v. Colbourne Bros. Co.,* 115 Md. 107,

117, 80 A. 916; 1 *Clark on Receivers,* sec. 223. "So long as the majority, acting in good faith, are in favor of going on, the minority shareholders are without remedy, although bankruptcy may be the probable consequence of continuing." *France on Corporations,* sec. 163.

The company owes taxes for three years amounting to about $2,000, but there is no evidence of its inability to pay them. On the contrary, there is evidence that it can. There is a provision in the by-laws for the borrowing of money up to $3,000 "to meet the exigencies of the business" of the corporation; but in no event shall any sum in excess of this amount be borrowed "without previous authority from the stockholders." It has a building not used in the operations of the company, upon which, according to the evidence, this amount could be easily raised.

Although it has been held that inability to meet its debts in the ordinary course of business is evidence of insolvency such as to justify a receivership, by the Acts of 1933, chapter 531, sec. 1, the circuit courts of the state "shall not appoint a receiver or receivers only because of the inability of a debtor to pay his or its debts as they become due in ordinary course of business; or because of an apparent excess of liabilities over assets unless, in determining such excess, said assets shall be valued at their fair market value," but "notwithstanding any allegation or proof of insolvency, the appointment of a receiver shall remain in all cases within the sound judicial discretion of the court." In view of the apparent present ability of the foundry company to provide for its outstanding obligations, it seems unnecessary to invoke this statute.

The principal grievance of the plaintiffs is the payment of the three dividends on the fifteen shares of common stock in the years 1926, 1927, and 1928, and they contend that the two common stockholders should be required to pay to the receivers "for the benefit of the creditors and preferred stockholders all excessive dividends by them received", and "all salaries in excess of fair compensation." This contention .

was erroneously decided favorably to the plaintiffs, on their demurrer to the fourth paragraph of the answer, in which the defendants' allegations expressly submitted the question of the preferred stockholders' right to have their dividends equalized with those paid to the common stockholders. The court declined to express an opinion as to the liability of the Messrs. Evans, and dismissed the bill as to them without prejudice. We think, however, that the question of their liability for any excess of dividends over the rate allowed the preferred stockholders has been decided by the ruling on the demurrer to the fourth paragraph of the answer, and an opinion expressed thereon by the lower court, and, as bill and answer both submit the question, we shall here decide it, and as this is the principal ground alleged for the appointment of the receivers, it cannot be ignored. If there could have been no declaration of common stock dividends in excess of such amount as might be distributed to the preferred stock, then the only question here involved would be one of procedure, and if the excessive common stock dividends could be recovered without a receivership it should be so done. *Howeth v. Colbourne Bros. Co.*, 115 Md. 107, 115, 80 A. 916. If, on the other hand, the preferred stock was not entitled to share with the common in dividends on the latter in excess of six per cent., there would be nothing illegal about the dividends if the corporation was solvent and the capital not impaired. Code, art. 23, sec. 87.

"Preferred," as applied to stock, means preference or priority over common stock in the payment of dividends out of net profits or earnings. Ever since the Acts of 1908, ch. 240, sec. 34 (Code, art. 23, sec. 38), the law in this state has been that it shall have "such preferences, voting powers, restrictions and qualifications thereof not inconsistent with law as shall be expressed in its charter." The preferred stock of the foundry company was issued by the authority of an amendment to its charter made February 18th, 1909, and approved by the judges of the Circuit Court for Cecil County, whereby it was authorized to issue 650 shares of preferred

stock, all of the preferred stock outstanding being issued out of the stock so authorized, it being provided by the charter as so amended that: "The holders thereof are to receive, and the said corporation be bound to pay an annual dividend of not less than six per cent. before any dividend shall be paid to the holders of the common stock of said corporation; and that each stockholder of said corporation, preferred and common, shall be entitled to one vote for every share of stock standing in the name of said stockholder, and that in the event of any liquidation, dissolution or winding up, (whether voluntary or involuntary) of the said corporation the holders of the preferred stock shall be entitled to be paid in full, both the par amount of their shares and all dividends unpaid thereon before any amount shall be paid to the holders of the common stock thereof; and after payment to the holders of the preferred stock up to its par value and any dividends thereon, the remaining assets and funds of the corporation shall be divided and paid to the holders of the common stock of said corporation according to the respective shares." The preferred stock certificates outstanding contain a *verbatim* copy of the provisions of the charter as just quoted.

The by-laws of the corporation provide that: "The Board of Directors are hereby authorized to declare semi-annual dividends among the holders of the common stock, if it shall appear that after the payment of all the debts and liabilities of said corporation and the payment of the guaranteed interest on the preferred stock upon a full and particular account of the assets of said corporation that there is a surplus standing to the credit of such common stock." The plaintiffs contend that this by-law is not now in force and has no application to the present preferred stock, but applied to the original preferred stock, none of which is outstanding, by which it was provided that a guaranteed dividend of six per cent. *per annum,* payable January and July, should be paid. That is not our view of the by-law. The corporation has paid dividends on the preferred stock in accordance with the provisions of the by-law as it existed when the charter was

amended, and continued the same policy to the 1st day of July, 1929, and all of the parties, plaintiffs and defendants, have acquiesced and, by their observance, have assented to it. While no evidence can be received which may vary the terms of the contract, in this instance the amended charter and stock certificate, the court is not shut out from such resolutions, agreements, and by-laws as may throw any light on the subject, to enable it to say what the contract means, and in arriving at a conclusion the court may put itself in the situation of the parties who made it. *Balto. & O. R. Co. v. Brydon,* 65 Md. 198, 611, 3 A. 306, 9 A. 126; *First Nat. Bank v. Gerke,* 68 Md. 449, 13 A. 358; *Roberts v. Bonaparte,* 73 Md. 191, 20 A. 918; *Phoenix Pad Mfg. Co. v. Roth,* 127 Md. 540, 544, 96 A. 762. This is exactly what was done in *Scott v. Balto. & O. R. Co.,* 93 Md. 475, 499, 49 A. 327. In the construction of a contract which is "plain and free from all ambiguity, it will not be construed by the acts and admissions of the parties in reference to it, yet, where the intention is obscure or doubtful, and extrinsic evidence can be invoked, no evidence is more reliable or entitled to greater consideration, as manifesting what their intention was, than the acts and conduct of the parties themselves." *Citizens' Fire Ins. Sec. & Land Co. v. Doll,* 35 Md. 89, 107; *A. L. Inst., Contracts, Restatement,* sec. 235e.

The amended charter and stock certificates both provided that an annual dividend of not less than six *per cent.* should be paid the holders of preferred stock, so that, in the absence of resolutions or other evidence of any action of the board of directors fixing the dividend rate from time to time, it is not improper to assume that they observed the practice prescribed by the by-law, which had never been revoked, as applicable to a minimum dividend of six *per cent.* which they were "bound" to pay. The chancellors, in their opinion, said: "It is quite singular, in view of the aforegoing provisions of the certificate and of the prosperous condition, in time long ago passed, of the company, why some interpretation of the certificates was not had as to whether this stock

is' participating stock." Mr. Miller did not testify, but his co-plaintiff, Fenton, did, having testified that he had been the bookkeeper from January 4th, 1914, until August 7th, 1931, when he was discharged. There is another thing that puts the plaintiffs on notice of what was going on, and that is that, from the beginning, the preferred stock had voting power and at all times outnumbered the common stock holders. The natural answer to it all would seem to be that, as long as they were getting their dividends, things were all right, and nothing was wrong until the revenues stopped. They at all times had their remedy for the correction of any illegal or *ultra vires* acts of the corporation. *Supreme Lodge v. Simering,* 88 Md. 276, 288, 40 A. 723.

Now, as to the contention of the plaintiffs that the defendants, William Sterling Evans and Standley Evans, should be required to refund such part of the common stock dividends received by them as would equalize the common and preferred stock dividends:

The only case in this court in which there has been a construction of a provision in a preferred stock certificate for the payment of a specified dividend with reference to a common stock dividend was *Scott v. Balto. & O. R. Co.,* 93 Md. 475, 49 A. 327. In that case the holders of the four *per cent.* preferred stock contended that they were not only entitled to the prescribed four *per cent.* dividend, but that each share of preferred stock was entitled to share equally in any distribution by way of dividend with each share of common stock. The opinion is expressed in 1 *Cook on Corporations* (6th Ed.), sec. 269, "that unless the contract expressly provides otherwise, preferred stockholders participate in the surplus profits remaining after the preferred dividend has been declared on the preferred and an equal dividend on the common stock." This view is supported by Mr. Machen in his *Modern Law of Corporations,* sec. 555. Mr. Cook then, after stating this to be the proper rule, said: "It has been held, however, in Maryland (*Scott v. Balto. & O. R. Co.,* 93 Md. 475, 49 A. 327) that where preferred stock is entitled .

to dividends 'up to but not exceeding four *per cent.* before any dividends shall be set apart or paid on the common stock,' such preferred stock is not entitled to dividends in excess of four *per cent.* even though a larger dividend than four *per cent.* is paid on the common stock, and even though the preferred dividends are not cumulative." In a note discussing the opinion, Mr. Cook said: "In this case the reasoning of the court went still further and was to the effect that preferred stock is never entitled to dividends in excess of the amount specified, even though the dividends are non-cumulative." And then he says: "Theoretically it is difficult to justify this conclusion, but practically it is true that the investing public assume and understand that preferred stock is never entitled to more than its specified and fixed dividends, even though the certificate is silent as to further dividends in case a higher dividend is paid on the common stock. A share of stock is a share of stock, whether preferred or common. A share of preferred stock has all the rights of a share of common stock except as expressly restricted by the terms under which it is issued. Logically, there would seem to be nothing in the words 'preferred dividend' restricting the preferred stock to that dividend, after an equal dividend had been paid on the common stock, and certainly not after any arrears or equal dividends had been made up and paid on the common stock." *Mr. Machen,* sec. 555, citing the same view as adopted in *Re Alexandra Palace Co.,* 21 Ch. Div. 149, 157, says: "It is submitted that this is the better general rule, and that the case in the Maryland Court of Appeals, if it is to be regarded as more than a mere *dictum* on this question, shall be supported upon the special circumstances adverted to by that court in its opinion." Mr. Cook then proceeds: "There is nothing in the word 'preferred' which restricts or cuts down the rights which at common law are inherent in all stock. It is settled law that upon dissolution the preferred stock shares *pro rata* with the common stock in the distribution of the assets after payment of debts, even though such assets are in excess of the par value of both kinds

of stock. The same rule would seem to apply to a distribution of profits in excess of the full preferred dividend and of an equal dividend on the common stock." And then he concludes: "However, the question may still be considered an open one." We have quoted the note from *Cook on Corporations* at length not only because it discusses the only case of the kind had in this court, but because it presents the theoretical or common law rule of construction, and the popular or general understanding of the public, which deals and invests in stocks. And it further recognizes the fact that the question is not settled, but is "an open one".

There can be no question that the popular rule, where there are no restrictions, is that the preferred stock is entitled only to be paid the fixed or prescribed dividend, and that the things that appeal to the investor are the rate, regularity of payment, and whether unpaid dividends are cumulative, and these are the factors which determine its marketability and value, and when these conditions are met, any additional earnings or profits are available to the common stockholders. The case here involves only a small local corporation, locally owned, but what we say with reference to its preferred stock will apply with equal force to larger corporations, the stock of which may be widely scattered among people who have no acquaintance or familiarity with its operations, charter, resolutions, and by-laws. Their only source of information is the stock certificate, if they read it, and they do not often see that until it is bought and paid for. In view of what we regard, and Mr. Cook says, is the common understanding of the investing public, it is the opinion of this court that the sound rule is, unless otherwise provided, that preferred stock dividends are limited to the rate prescribed by the charter of the issuing corporation and stated in the certificate, and that they are not cumulative unless that is provided. *Scott v. Balto. & O. R. Co.*, 93 Md. 475, 49 A. 327.

In this case, however, it is only necessary to resort to the amended charter to ascertain that there was not only no

intention that the preferred stock should participate in the dividends with the common stock, but that its privileges and restrictions were exclusive of any rights which the common stock had except that of voting. It is entitled to "an annual dividend of not less than six *per cent.* before any dividend shall be paid to the holders of the common stock." This is the usual and ordinary provision and, without anything further, is the foundation of the view expressed as the logical one in both *Cook* and *Machen on Corporations, supra.* It is cumulative though it does not use the word. The charter says the corporation shall "be bound to pay an annual dividend," and in the event of liquidation "the holders of the preferred stock shall be entitled to be paid in full both the par amount of their shares and all dividends unpaid thereon," before anything is paid the common stockholders. What dividends? The only dividends unpaid were those which had accumulated at six *per cent.* since July, 1929. Then the charter provides that, after the payment of debts, preferred stock, and unpaid dividends, "the remaining assets and funds of the corporation shall be divided and paid to the holders of said common stock * * * according to their respective shares." If this last clause means anything, it means that, after the preferred stockholders are paid par for their stock plus the unpaid dividends annually allotted to them, they are through, and any surplus earnings, profits, dividends, or property are, in the terms of the charter itself, the property of the common stockholders.

It is therefore the opinion of this court that a receivership is, at this time, unwise and unnecessary, and so much of the decree as directs a receivership should be reversed, and that the dismissal of the bill as to William Sterling Evans and Standley Evans should be affirmed.

> *Decree reversed in No. 35, and affirmed in No. 36; the appellees in No. 35 and the appellants in No. 36 to pay the costs.*