JOHN W. COFFMAN *v.* MARYLAND PUBLISHING COMPANY ET AL.

[No. 48, April Term, 1934.]

*Decided June 14th, 1934.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Wilson L. Townsend,* for the appellant.

*T. Howard Duckett,* with whom was *Charles C. Marbury* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Maryland Publishing Company is a Maryland corporation, having an authorized capital stock of $150,000 in preferred stock, divided into 1,500 shares of the par value of $100 each, of which $40,000 has been issued, and 6,000 shares of common stock having no par value. The preferred stock provides for a cumulative six per cent. dividend but has no voting privileges. It was incorporated to carry on a general publishing and printing business, but its principal business is the publication of a weekly newspaper known as the Maryland News. In connection with that business it acquired in 1927 three other weekly newspapers published in Montgomery County, Maryland, and known as the Chevy Chase Gazette, the Montgomery News Advocate, and the Takoma News, all of which were consolidated and published from that time as the Maryland News.

At that time the Takoma News was owned, managed, and published in Takoma Park, Maryland, by John W. Coffman, who for an unnamed consideration sold it to the Maryland Publishing Company on July 30th, 1927, and accepted in part payment of the purchase price sixty shares of the preferred, and sixty shares of the common, stock of the new corporation. Under the certificate of incorporation, 3,050 shares of the common stock of the Maryland Publishing Company, that being a controlling interest, were issued to E. Brooke Lee as compensation for services rendered by him in "the organization of the Company," and from that time the paper was published, and the company operated, under his control, management, and direction. In the course of its business, the company from time to time borrowed money from Lee, and on March 25th, 1933, it executed to him a "chattel deed of trust" to secure the payment of certain notes payable to him aggregating $75,000 in amount, and which

for that purpose pledged all the property and assets of the company.

On December 29th, 1933, Coffman, on his own behalf, and on behalf of other stockholders who might come in, filed the bill of complaint in this case against the Maryland Publishing Company and E. Brooke Lee, in which he prayed the following relief:

"1. That a Receiver be appointed by this Honorable Court to take charge of and manage the affairs and conduct the business of the said Maryland Publishing Company, pending further order of the court in the premises.

"2. That the said E. Brooke Lee may, by injunction, be restrained from transferring, negotiating, or in any way disposing of said notes of said corporation, pending the determination of this case.

"3. That the said chattel deed of trust and the notes secured thereby be held to be null and void and of no effect and that said notes be delivered up for cancellation.

"4. That an account be stated by the Receiver appointed by this court setting out the financial condition of said corporation and that said receiver be instructed to disallow, as an obligation of said corporation any and all moneys loaned by the said E. Brooke Lee to the said corporation to meet deficits incurred through additional expense growing out of printing and publication of said Maryland News in the interest of personal political policies.

"5. That in the event it appears from the report of said receiver that said corporation is insolvent and its continued operation is detrimental to the interest of said stockholders said corporation may be dissolved and its assets liquidated and distributed.

"6. That your orator may have such other and further relief as his case may require."

The allegations of the bill upon which those prayers rest are, in addition to what has been stated, (1) that Lee used and operated the paper as a vehicle for partisan propaganda to further his own personal and political ambitions as well as those of the political organization with

which he was identified, and that as a result of that management there was a continuous operating loss which resulted (2) in the insolvency of the company; (3) "that said operating deficits have been financed by loans from the said E. Brooke Lee to the said corporation for the purpose of maintaining said newspaper as a partisan political organ, and said corporation has thus become heavily involved in debt to the said E. Brooke Lee by reason of the gross mismanagement of said corporation and disregard of the rights and interests of the stockholders, and said corporation has been and is unable to meet its current obligations without the aid of the money thus loaned to the said corporation by the said E. Brooke Lee, the aggregate of which loans now greatly exceed the assets of said corporation, and said corporation is insolvent"; (4) that no stockholders' meetings were called in 1928, 1929, or 1932; and that (5) the president of the company, in violation of his statutory duty, has failed except in one instance to file an annual report of the affairs of the company.

To that bill the defendants filed a general demurrer, and from a decree sustaining that demurrer the complainant appealed.

The allegations of the bill may in respect to the relief sought be considered as falling into two categories: (1) Those relating to the policy and management of the company, and (2) those having to do with its solvency.

The material allegations of the bill classified under the first caption are that: "The said directors and officers, under the direction of the president, E. Brooke Lee, have adopted as the primary policy of said newspaper the promotion of the political partisan aims and projects of the political organization of which the said E. Brooke Lee was and is the leader, and have utterly disregarded their fiduciary duty to the stockholders of said corporation to manage and operate said newspaper and said corporation as a business enterprise for the advantage and interest of said stockholders. That in following the selfish and personal policy of the said officers and directors to operate

said newspaper primarily as a partisan political organ and vehicle of propaganda, said newspaper during long periods of time has been published with grossly excessive pages of political propaganda at great and unjustifiable expense, not warranted by its circulation or financial condition, in violation of all principles of sound business management. That during the political campaigns, when said newspaper was so printed with excessive and unjustified additional pages, great numbers of additional copies of said paper were printed for free distribution at great expense to said corporation and with no financial return, in furtherance of the aims of said officers and directors to promote the political and personal ambitions of the said E. Brooke Lee and the organization of which he was and is the leader. That such gross negligence, mismanagement, and deliberate breach of fiduciary duties has resulted in a continuous operating loss in the business of said corporation, and by reason thereof said newspaper has been continuously operated at a loss of several thousand dollars annually."

Those relating to the alleged insolvency of the company are that it "has been and is unable to meet its current obligations without the aid of the money thus loaned to the said corporation by the said E. Brooke Lee, the aggregate of which loans now greatly exceed the assets of said corporation, and said corporation is insolvent," and "that the said corporation, as now managed and operated, is unable to meet the heavy interest charges and payments required by said notes and deed of trust, and upon inevitable default in payment of said interest and payments said assets of the corporation are liable to be sold, its business destroyed, and the investment of your orator and other preferred stockholders wiped out."

Reduced to their lowest terms, the charges of mismanagement, negligence, and "breach of fiduciary duties" are that the majority of stockholders of the company operating through Lee have managed the newspaper as a partisan political organ to promote the aims and ambitions of a partisan organization with which Lee was iden-

tified, and that, as an incident of that policy, it devoted more space to such propaganda than was consistent with sound business management, and printed "great numbers of additional copies of said paper" for free distribution. The essence of the complaint is, not that that conduct was immoral or evil *per se*, but that in the opinion of the complainant, it was unprofitable and resulted in a "continuous operating loss."

An elementary principle of equity pleading is that one who seeks relief in a court of equity must state fully, clearly, frankly, and with precision the facts upon which his claim rests (*Story, Eq. Pl.* secs. 240 *et seq.*, 251, 257; *Miller's Eq. Proc.* pp. 116-119; *Fletcher's Eq. Pl. & Pr.* secs. 85, 87, and 190) and mere opinions or conclusions will not be accepted as a sufficient substitute for facts, *State Founders, Inc., v. Oliver,* 165 Md. 380, 169 A. 59; *Fletcher, Eq. Pl. & Pr.* sec. 102; *Wootten v. Burch,* 2 Md. Ch. 198; *Dennis v. Dennis,* 15 Md. 73.

Tested by that standard, the charges of fraud and mismanagement appear to be insufficient, because at most they amount to no more than that, in the opinion of the complainant, the policy of the majority stockholders of operating the newspaper as a partisan organ is unprofitable. There is no allegation that, if operated as an organ for some other and different political organization than that said to be dominated by Lee, or if operated as a mere agency for furnishing to the public information concerning current events, or items of literary or educational interest, having no fixed policy or views upon controversial questions affected with a public interest, it would have fared better. However difficult it might be to state facts supporting such a conclusion, nevertheless, where none are stated, it cannot be assumed that, because the policy of which the appellant complains has resulted in a loss, a different policy would not have resulted in an even greater loss. In other words, while it is sufficiently stated that the operation of the paper is unprofitable, it does not appear whether that condition is due to the policy adopted by a majority of the stockholders or to the fact

that in the field in which the paper is established there is no demand sufficient to permit the profitable operation of a weekly newspaper. It is true that the appellant states the conclusion that the mismanagement of the appellees resulted in a loss, but neither facts nor reasons are given to support the conclusion. It cannot be assumed from the mere fact that the paper is operated as a political organ that its officers and directors are guilty of such fraud and mismanagement as to warrant the appointment of a receiver. For, if that were so, a substantial proportion of the metropolitan and rural press of the country would be operated by the courts instead of by their owners.

Nor are the allegations that the president of the corporation failed to file annual reports as required by law, or that in certain years no elections were held, in themselves sufficient ground for the intervention of a court of equity in the affairs of the corporation, since mandamus furnishes an adequate and sufficient remedy to compel the performance of such corporate duties as are involved in that complaint. *Fletcher, Cyc. Corp.* secs. 3277, 3285, 3286.

But, while appellant concedes so much, he nevertheless contends that they eke out other allegations of the bill charging illegal conduct and mismanagement, to establish a case justifying the appointment of a receiver. In view, however, of the fact that the complainant had abundant opportunity, from an inspection of the issues of the newspaper over a period of something more than six years, of discovering the particular kind of mismanagement of which he now complains, such allegations add little to the more specific charges of what is referred to in his brief as "fraud and mismanagement." But the charges in the bill do not support that conclusion. For, since it cannot be said that it is inherently wicked, evil, or vicious to operate a newspaper as a political organ, no fraud is committed on the stockholders of the corporation publishing it, if it is so operated with their approval and acquiescence. And, as the complainant knew of the

policy of the newspaper, and failed to protest against it, it may well have been inferred that he acquiesced in it.

But, while these allegations are not sufficient to establish such mismanagement as would in itself justify the appointment of a receiver, the allegations relating to insolvency are of a more substantial nature.

Summarized, they are that the newspaper has been operated continuously at a loss of several thousand dollars annually, that it is unable to meet its current obligations without borrowing money, and that its liabilities exceed its assets. It has been held that the test of insolvency in such a case as this is an inability to pay debts as they become due in the ordinary course of business (*Howeth v. Coulbourne Bros.*, 115 Md. 115, 80 A. 916, 920; *Clark v. Colton*, 91 Md. 229, 46 A. 386), and the fact that at a given time the liabilities of the corporation may exceed its corporate assets is not in itself conclusive of the question, for, as stated by Chief Judge Bond for this court in *Coblentz v. State*, 164 Md. 575, 166 A. 45, 52: "Insolvency within the meaning of the statute, as this court construes it, is not always a fact to be ascertained by simple arithmetic, leaving no room for doubt or difference of opinion. 'It is very rarely, indeed, that the financial situation of a corporation is so perfectly defined that it continues solvent up to a given instant, and is immediately thereafter insolvent. In almost all such cases there is a period of struggle, during which efforts are made to rescue the enterprise from threatened insolvency.' *Reed v. Helois Carbide Specialty Co.*, 64 N. J. Eq. 231, 243, 53 A. 1057, 1062; *Hoagland v. U. S. Trust Co.*, 110 N. J. Eq. 489, 160 A. 662. The statute cannot, we think, be reasonably supposed to intend that at any moment, when there is perceived to be an unfavorable balance of liabilities and assets at market quotations, bank officers shall in every instance abandon all hope, make no effort on behalf of the body of existing depositors, however great the chance or probability of success, and close. Action must be guided by reasonable expectations, looking to the interest of all who hold obligations of the com-

pany, and some effort to work out of temporarily embarrassing conditions must be contemplated." And that statement was consistent with *Howeth v. Coulbourne, supra,* where it was said: "So far is this doctrine carried, that, as Mr. France says in section 163 of his Elements of Corporation Law, 'so long as the majority, acting in good faith, are in favor of going on, the minority shareholders are without remedy, although bankruptcy may be the probable consequence of continuing'."

In this case the allegations of the bill do not meet that test, for, while it is stated that the corporation cannot meet its current obligations "without the aid of money" loaned it by Lee, it is undisputed that with that aid it can and does meet such obligations, nor, indeed, is there any allegation that it is indebted at all except to Lee. While the fact that the corporation is required to borrow money to pay its debts is consistent with insolvency, it is also consistent with solvency, for it may be inferred that, if it has sufficient credit for that purpose, it is solvent, even though the money is loaned by its principal stockholder. *Dollar Cleaners v. McGregor,* 163 Md. 109, 161 A. 159. While the good faith of such a transaction is always open to inquiry, it is not invalid, and it cannot be assumed that one standing in that relation to the corporation would be any more willing to sacrifice his personal assets in paying the debts of an insolvent corporation than would a stranger.

Nor is the naked statement that the liabilities of the corporation exceed its assets sufficient to permit such an inference of insolvency as would justify the appointment of a receiver, especially in view of chapter 531 of the Acts of 1933, which provides:

"116A. The Circuit Courts for the Counties of the State of Maryland and the Circuit Court of Baltimore City and the Circuit Court No. 2 of Baltimore City shall not appoint a receiver or receivers only because of the inability of a debtor to pay his or its debts as they become due in ordinary course of business; or because of an apparent excess of liabilities over assets unless, in de-

termining such excess, said assets shall be valued at their fair market value.

"116B. Notwithstanding any allegation or proof of insolvency, the appointment of a receiver shall remain in all cases within the sound judicial discretion of the court."

Not only is the validity of that act unchallenged, but that statement of the law harmonizes with what was said in *Steinberger v. Sav. Assn.*, 84 Md. 636, 36 A. 439, 440, quoted with approval in *Callaway v. Powhatan Imp. Co.*, 95 Md. 185, 52 A. 916: "To declare the appellee to have forfeited its rights, privileges, and franchises, to be insolvent, and to be dissolved, and to place its affairs in the hands of a receiver, in the absence of some controlling rule of law imperatively demanding it, and which does not here exist, would be lending the aid of a court of equity to the wrecking of a corporation, entailing great and useless loss and injury to its shareholders."

Apart from those considerations, if the corporation is in fact insolvent, the complainant would have no interest in the subject-matter of the suit, for, as a mere holder of stock, common or preferred, he would be entitled to nothing from the corporation until its creditors were satisfied. And, if its assets are not sufficient to pay its creditors, manifestly he would receive nothing from any distribution of those assets. *Rider v. John G. Delker & Sons Co.*, 145 Ky. 634, 140 S. W. 1011; *Tardy's Smith on Receivers*, sec. 305; *High on Receivers*, sec 292; Code, art. 23, sec. 38.

Moreover, mere insolvency without more is not sufficient to justify the appointment of a receiver at the suit of a stockholder *(High on Receivers*, sec. 292), but that relief will be granted in such a suit only when it appears that, because of the wasteful, fraudulent, or *ultra vires* acts of the corporate managers, the management of the corporation by a receiver will probably be more successful in protecting the corporate assets than that of its duly constituted officials. The demurrer concedes that the appellee, operating through officers whom he named and controlled, continued the publication of the news-

paper at a heavy continuous annual loss, not as a business adventure, but as a convenient vehicle for progaganda designed to serve his personal and political ambitions and interests, and those of the political organization of which he is the leader. It further concedes that, to maintain it as a going concern, he personally advanced the money to enable it to pay its current debts, and that those loans, evidenced by the mortgage deed of trust, are now so great that the corporation "as now managed" is unable to meet the interest charges payable under the mortgage, that default is "inevitable," and that upon such default the assets of the corporation are liable to be sold, and the investment of the preferred stockholders "wiped out."

It is not disputed that Lee did actually make the loans secured by the mortgage, but appellant contends that, since the losses resulted while Lee was in control of the corporation, and as a result of his policy of operating it for his own purposes as a partisan political organ and vehicle of propaganda, he should bear them. For reasons stated above, the operation of the newspaper as a partisan or political organ did not in itself constitute fraud, nor should fraud be inferred from the circumstance that in serving the organization with which Lee was identified it also served him, if the stockholders of the corporation with knowledge of its policy acquiesced in it. And, since there is no allegation that they ever objected to or protested against it, and since its policy was patent upon the face of its publication, it must be inferred that they did have knowledge of it and did acquiesce in it. *Tardy's Smith on Receivers,* sec. 205; 14 *C. J.* 958.

But, while the allegations as to mismanagement and insolvency are not sufficient to justify the appointment of a receiver, the question remains as to whether they are sufficient to require an answer in respect to so much of the bill as prays the cancellation of the mortgage to Lee, and a judicial inquiry to ascertain whether its continued operation will jeopardize the investment of its shareholders.

The case is in this court on a demurrer which for its purposes admits that the paper has been operated continuously at an annual loss of several thousand dollars, that those losses have been met by loans to it by Mr. Lee, which now in the aggregate exceed the assets of the corporation, and that those loans in whole or in part are secured by a chattel deed of trust for $75,000, and that it has been so operated to serve the personal ambitions and policies of a majority of the stockholders. In connection with those allegations, it must be noted that, upon appellant's own statement, if the mortgage to Lee is valid, the corporation is insolvent, and he (Coffman) has no interest in its assets, since his claim would be deferred to those of its creditors, but, if the mortgage and the loans thereby secured to Lee are held to be void, while the corporation would be solvent, the question would remain as to whether the majority stockholders have the right to continue to operate it at a loss, when such operation would result in the ultimate destruction of the investment of a minority stockholder. The controlling question, therefore, is whether the loans made by Lee and the mortgage given to secure them are void. The mere fact that the mortgage created a preference is without significance, since the appellant is a stockholder and not a creditor, *Mowen v. Nitsch,* 103 Md. 685, 62 A. 582; Code, art. 47, sec. 8; *Heller v. Nat. Marine Bank,* 89 Md. 606, 43 A. 800; Code, art. 39B; *Id.* art. 47, sec. 14; *Id.* art. 23, sec. 38. And neither as creditor nor stockholder did he attack the conveyance within the time limited by law, *Hammond v. Lyon Realty Co.,* 163 Md. 442, 163 A. 480.

Nevertheless, apart from any question of actual fraud, there must be a point at which the officers and directors of a corporation, who continue for purposes of their own to operate it at a loss when they know that there is no reasonable hope of recovery, and that that loss must come out of the investment of the stockholders, do so at their own risk. And where, in pursuance of such a policy, they advance money to cover such losses and permit the loans to accumulate to an amount exceeding the aggregate value

of the corporate assets, in view of their relationship to the corporation, it may well be questioned whether they are entitled to reimbursement from the corporate assets. They stand in a fiduciary relationship both to the corporation and to the stockholders (14a *C. J.* 97-99), and may not under any circumstances use the power intrusted to them to promote their personal interests at the expense of the stockholders. *Id.* If it appears that what they did was done in the exercise of an honest and reasoned judgment, they are not liable because their judgment happened to be erroneous (14a *C. J.* 102; *Foutz v. Miller,* 112 Md. 458, 76 A. 1111), nor are they liable to the stockholders for acts ratified by them, or to which the stockholders with notice thereof failed to make prompt objection. 14a *C. J.* 101. But if, on the other hand, it appears that there has been no such knowledge or acquiescense, and that the acts of the corporate officials were not only detrimental to the corporation, but that in doing them they subordinated its interests to their own, they may become liable to it for any loss thus occasioned.

The bill in this case is neither full nor candid, and is in some respects evasive; nevertheless, applying those principles to the allegations which are made, the defendants should have been required to answer it in respect to the relief sought in its third prayer.

And if, as a result of the litigation of that question, it should appear that the corporation is solvent, the appellant would also be entitled to have the question, as to whether the continued operation of the corporation should be permitted, considered and adjudicated. The appellant is therefore entitled to have an answer to the allegations of the bill in reference to that relief.

But while that is the opinion of the author of this opinion and Judge Parke, a majority of the court take the view that the allegations of the bill even in respect to that relief are too vague, general, and inconclusive to gratify the plain requirements of sound equity pleading, and that, before the defendants should be required to answer and defend charges so severe and serious, they should first

be informed, clearly, definitely, and with reasonable precision, of the facts upon which the charges rest; and that, as the plaintiff has not met that primary and essential requirement, the demurrer to the whole bill was properly sustained, and that, since he declined to amend, the bill was properly dismissed.

*Decree affirmed, with costs.*